MUTUAL BENEFIT ASSOCIATION OF MICHIGAN v. ENOS HOYT.

*Insurance of stranger—Defence based on public policy.*

An insurance policy issued for the benefit of a person who is neither an heir nor a relation of the assured, and whose interest is not promoted by the latter's continuing alive is in the nature of a wager policy, and void as against the public interests.

A party to a contract deliberately made without fraud or deceit is in no position to defend against it on grounds of public policy, but the defence is allowed in the public interest.

Error to Wayne. Submitted June 28. Decided July 1.

ASSUMPSIT. Defendant brings error. Reversed.

*Conely & Lucking* for plaintiff in error. A policy of insurance on the life of another is void as against public policy when it is a mere basis for speculation in the interest of the beneficiary: *Gilbert v. Sykes* 16 East 157; *Evans v. Jones* 3 H. & C. 77; *Hartley v. Rice* 10 East 22; *O'Hara v. Carpenter* 23 Mich. 410.

*Atkinson & Atkinson* for defendant in error.

MARSTON, C. J. The plaintiff in error is organized under chapter 94 of the Compiled Laws. The act authorizes any number of persons not less than five to organize as a corporation, for the purpose of securing "to the family or heirs of any member upon his death" a certain sum of money, to be paid out of the corporate funds or by an assessment upon the members in the class to which the deceased belonged. The principal facts in this case are, that Isaiah Phair, on the 22d day of November, 1879, made a written application, upon

46 473
76 151
46 473
92 588
46 473
94 44
46 473
106 139
46 473
126 283
46 473
s 9NW 497
d132 1 73
46 473
136 ¹399
46 473
152 ¹269
d152 271
d152 272
152 ¹273

one of the blank forms of the association, for a five thousand dollar certificate, to be made payable to Enos Hoyt. In this application Phair was asked to state "relation of the beneficiary (Hoyt) to the applicant" and the answer given thereto was "No relation." The proper medical report was made, money premium paid, and a certificate issued on the 25th day of November, a copy of which is given in a note herewith.*

Phair died March 4, 1880, and at the time of his death there were but 1135 members of the association in the class in which he was insured. The association declined to pay upon several grounds, the most important, and the only one we shall consider, being that Hoyt was not a member of Phair's family or one of his heirs. As showing the relations existing between Phair and Hoyt, the testimony of the latter is given in full herewith.†

---

*THE MUTUAL BENEFIT ASSOCIATION OF MICHIGAN—CERTIFICATE No. 4051—AGE AT ISSUE, 33–7–3—AMOUNT OF CERTIFICATE, $5000.

In consideration of the application for this certificate, which is hereby referred to and made part of this contract and of each of the statements made therein, and in further consideration of the first payment (four dollars), receipt whereof is hereby acknowledged, and of the further payment of the semi-annual dues of one dollar, on or before the first days of July and January of each year, and upon the notice of any assessment and the prompt payment of the same (said assessment never to exceed one dollar and ten cents) during the continuance of this contract, does promise to pay to Enos Hoyt, friend of Isaiah Phair, of Jackson, in the State of Michigan, his executors, administrators or assigns, the sum of five thousand dollars within ten days after due notice and proof of the death of Isaiah Phair; *provided*, there be five thousand members,of the association in good standing. In case the number of members of the association shall be less, then a sum of as many dollars as there shall be members at the death of Isaiah Phair. If the above-named dues or assessments are not paid as provided for in the articles of incorporation and by-laws of the association, then this certificate shall be inoperative and void. In witness whereof, the Mutual Benefit Association has caused this certificate to be signed by its president and secretary at its office in the city of Detroit, this 25th day of November, 1879.
J. W. McGRATH, Secretary.          GEO. C. LANGDON, President.

†I am the plaintiff in this case. Phair first came to board with me in December, 1878, and stayed till April 25, 1879. He returned on September 7, 1879. He came back as a boarder, and stayed as such boarder till December 25th.
Question. State whether there was any arrangement or agreement between you and Mr. Phair as to his becoming a member of the family and remaining in the family during his life-time?
Objected to by defendant as incompetent and immaterial; also incompetent to contradict the statement of no relationship set out in the application; also because the certificate purports to insure a friend, and it cannot be shown that the family relationship existed; also as irrelevant to the issue. Objection overruled. Exceptions for defendant.

This case seems to be peculiar, and if not one of fraud,. then from the very inception, it would appear at least to be delusive and deceptive. While the insurance, if such it may be called, was for five thousand dollars, and the premium paid was for this sum, yet the actual amount was fixed by

A. He was to live with me as long as he lived. As long as I had a. home he was to have one with me ; after that he was treated as a member of the family. This arrangement was made about the time the policy was got out. I was keeping hotel at that time. Q. What, if anything, did he do around the hotel after this arrangement? A. He was not obliged to do anything. He used to do chores. Q. Seemed to take an interest in it and work around as the rest of you? A. Just about the same. Q. Whether during that time and after this arrangement and up to his death he worked at your house around doing chores as .your wife would call on him? A. Yes, sir. Q. And between the two places lived with you as a member of your family? A.. Yes, sir; just the same. Q. And under an agreement with you to that effect? A. Yes, sir. Q. You say he came and went, and in all respects conducted himself toward you, and you treated him, as one of the family? A. Just about the same, sir. He went away in December to Eaton Rapids and came back the latter part of January. When he came back I needed a man, so I told him if he wanted to, I would give him $10 a month, the same as I would have to pay another man, so he stayed there as night watch until he got so. sick he could not work. Q. So that from the time he came back, in addition to treating him as a member of the family, you allowed him $10 a month for some work he did? A. Yes, sir. Q. Who took care of him? A. Some of the help in the house. Q. Under whose instructions? A. Mine. Q. Who paid the bills? A. I did. Q. Who called in the doctor? A. I did. Q. Who paid them? A. I did. Q. Who paid the expenses of burying him? A. I did. Q. State whether Phair was indebted to you at the time of the issuing of the policy.

Objected to for the same reasons as like testimony of the witness Foster. Objection overruled. Exception for defendant.

A. Yes. He was owing me about $200; don't know exactly how much. Q. And if you had charged up for all you did for him after he. became a member of the family, how much would he have owed you at the time of his death? A. About $600.

*Cross-examination.* Phair was not in any business when he first- came to my place. Did not know where he came from. He was to pay me. $5 per week. He never paid me anything. He did not do anything; had no employment. I kept my account with my boarders in a large book; charged them with board and gave credit for payments. Q. Why didn't you charge Phair with his board? A. I did have him charged with his board until after he was insured. After he was insured I gave him his account. He was square. I gave him his bill. Q. You say you gave him a square account after the insurance? A. I gave him his bill. Yes, sir. It was just stated in the book Ike commenced to board such a date, so much per week. I tore the leaf out, and gave it to him. Q. He never paid you anything? A. No, sir. Q. Any others around you had boarding like that? A. I had one—George Proudfit. I did not know where Phair went after he left April 5, 1879. Didn't keep any track of him. Never dunned him for my pay while he was gone. No. arrangement was made when he came back in September, '79; just came and stopped. Q. You had at the Sheridan House Mr. White (bar-tender) and this man (Phair) working around? A. No, sir. I did not have this.

the number of members in the class to which the assured belonged, which turned out to be but a little over eleven hundred, so that the amount to be recovered was thus cut down.

Again, the application, signed by Phair, and delivered. to the company, and upon which the certificate was issued,

man working around the Sheridan House. He was there, but not working for me. I moved from the American to the Sheridan May, '79, and from there to the Central City House, December, '79. When he was staying with me from December, '78, to April, '79, I did not charge up his board in the books. Q. You charged the other boarders? A. No, sir. I didn't have any regular boarders. Q. Why did you keep him? A. He had been so long with me. Q. From December to April, between three and four months, do you call that a long time? A. Wouldn't you call it a long time if you had a man boarding with you and he did not pay? Q. So you kept him along because he had not paid you? A. I kept him along so as to get my pay. When he left me at Christmas time, after the insurance, he went to Eaton Rapids in a livery barn. He earned wages but did not pay them to me. Q. This was after he became a member of your family, wasn't it, according to your statement? A. Yes, sir. Q. When was it you tore his account out of the book and gave it to him? A. When I got the policy there; before he went to Eaton Rapids. He used to do a chore around once in a while. I have him charged with $33 for clothing—some clothes of mine had at different times. I made no charge of anything till this suit was commenced. Q. When you gave it to him you intended it as a gift, did you? A. Yes, sir. At any time when he worked for me before he came back from Eaton Rapids, I paid him five and ten cents a chore. Q. You have charged him in this memorandum with $5 a day for taking care of him the last ten days of his life. He was only confined to his room about four days before his death, was he not? A. That is all. Q. Was it worth $5 per day for the last ten days of his life? A. Yes, sir. Worth that to have him around. Q. Why didn't you send him to the hospital or pest-house? A. Because I had an insurance on him, and was to take care of him as long as he lived. Q. How old was he? A. Thirty-one, or 32, or 33, I think. Q. You stated a minute ago, didn't you, that at that time he was an able-bodied man? A. Yes, sir. Q. And you were going to take care of him all the remainder of his life for the insurance? A. I was to give him a home. Q. Was that the agreement? A. The agreement was that he was to have a home as long as I had it. He could go out and work as he had a mind to, and he could come home as he had a mind to. Q. So that, for the remainder of his life, 30 or 40 years, if it might be so long, you were to give him a home at any time? A. We did not expect this man was going to live there all his life at that time. If he wanted to go to work he could. Q. But he need not do it? A. No, sir. Q. So you agreed to board him for that insurance? A. I agreed to let him have a home. Q. Who paid for this insurance? A. I did. Q. So that for the insurance you were not only to give him a home, but you were to pay for the insurance itself? A. That was what I was to do. I don't think I swore anything before the coroner about Phair's being indebted to me. I don't recollect that the question was asked me. I understand the cause of Phair's death was congestion of the lungs. Q. What did you swear before the coroner's inquest was the cause as you understood it? A. Whisky, I think. Q. Why did you swear whisky at that time? A. From the very fact I heard the doctors talking. Q. You

showed clearly, and without any ambiguity or uncertainty, that the certificate to be issued was to be made payable to Hoyt who was no relation to the applicant. The certificate issued three days after the date of the application, referred to the application and made it and each of the statements

<hr />

knew he was a drinking man, didn't you? A. Yes, sir. I knew he was a drinking man. I did swear before the coroner that he had free access to the bar. That meant my bar. Yes; that was true. He did have free access. Q. And from all you knew he was a drinking man at the time he was insured? A. Yes, sir. There ain't many men insured who are not drinking men. Show me one, and I will show you a white blackbird. I did swear before the coroner's jury that I paid him $10 a month and board. Q. Why did you swear to that if he was a member of your family? A. I did. Q. What for? A. For being night-watch. Q. Did you swear before the coroner that he owed you anything? A. I don't recollect the question was asked me. Q. Did you swear he was a member of your family? A. I don't think the question was asked me. Q. They asked you how he was living there, and you said you were paying him $10 a month and board. You did not say he was a member of your family? A. The question was not asked me. I have been convicted several times of keeping a disorderly house. I paid all the fines I have ever been fined. Yes, sir. I was convicted once in the circuit court of keeping a house of ill-fame. Q. Did you swear before the coroner that Phair worked for you on and off for a year? A. I did. I meant that he had done chores for me on and off for a year. I paid him five or ten cents for what chores he did. Q. Do you mean to say that if he was owing you all this money, that nevertheless whenever he did a little work you paid him for it? A. Yes, sir.

Minutes of evidence of witness before coroner's jury here read as follows:

Deceased has worked for me about two months; has worked off and on for about a year. He acted as night watch. Understood his complaint was whisky. He was a man who drank pretty freely. I gave him $10 a month and board. Do not know of his having a family; understand he has a brother. I also have George Proudfit insured in my favor. Mr. Hoar found Phair dead this morning. He was filling Phair's place while he was indisposed. Phair had free access to the bar. Think he drank some outside of my place. I knew he was drinking when I had him insured. Captain Proudfit had his life insurance in my favor, and I mine in his. But when it came to paying for the policy he could not pay for mine, but I have kept his up. It was talking about this in Phair's presence the way I happened to get his policy. Q. Now, Dr. Crawford swore, Mr. Hoyt, that he attended Phair some time before the insurance, and that you paid him. Is that correct? A. Think I paid him 75 cents then. I was thinking that was at the American House; that is my impression. I don't remember any other time. I don't recollect how long this was before we moved from the American to the Sheridan; but I recollect paying him 75 cents. Q. Then you were not only allowing him his board without getting any money, but you were paying his doctor's bills? A. I paid 75 cents. I don't know what was the matter with Phair for which the doctor prescribed. Phair was not a man of any property that I know of. Some of the clothes were furnished before the insurance. Q. So that you were not only boarding him, but giving him clothes before? A. Yes, sir; a little.

therein a part of the contract, and the promise made in the certificate was "to pay to Enos Hoyt, *friend of Isaiah Phair*, of Jackson   *   *   the sum of five thousand dollars."

It is thus clearly apparent that the association in accepting the application, receiving the premium, and issuing the certificate, well knew that Hoyt was not a relative, and was not claimed to be a member of Phair's family or an heir, within even the most liberal construction. So that the association issued this certificate under circumstances which most strongly call upon the courts to enforce performance of their agreement, if certain imperative rules of public policy do not forbid.

The defence set up in this case must be considered as that of the public and not that of the defendant, as it stands in no position to interpose such a defence. *Lyon v. Waldo* 36 Mich. 353.

We need not discuss the other facts at length. The testimony of Hoyt shows that this contract was in the nature of a mere wager policy, and that his interest could not be promoted by prolonging the life of Phair. Such contracts are so clearly contrary to public policy that they cannot be upheld, and must be declared absolutely void.

The judgment in this case must be reversed with costs of both courts.

The other Justices concurred.