BELLARMINE HILLS ASSOCIATION v THE RESIDENTIAL
SYSTEMS COMPANY

Docket No. 77-3989. Submitted March 15, 1978, at Lansing.—Decided
July 6, 1978. Leave to appeal applied for.

George B. Hopping owned property containing a building restric-
tion in his deed limiting buildings on the property to single
family dwellings. The Residential Systems Company, a non-
profit charitable Michigan corporation, leased Mr. Hopping's
property and used it to permanently house a foster parent and
six or fewer mentally handicapped children who received spe-
cial care and treatment at the home pursuant to a license
granted by the Department of Social Services. Bellarmine Hills
Association is an incorporated association of homeowners hav-
ing their residences in the same subdivision as Mr. Hopping's
property. Bellarmine Hills Association filed suit against Mr.
Hopping and Residential Systems, seeking to enforce the re-
strictive covenant by enjoining the use to which the property
was being put. The Oakland Circuit Court, Frederick C. Ziem,
J., granted plaintiff's motion for summary judgment perma-
nently enjoining that use of the property. Defendants appeal.
*Held:*

1. It is the settled public policy of Michigan to promote the
development and maintenance of quality programs and facili-
ties for the care and treatment of the mentally handicapped.

2. Restrictive covenants may constitute valuable property
rights and it has been the policy of the judiciary to protect
property owners who have complied with the restrictions from
violations of the covenants by others; a restrictive covenant
describing the character of permissible structures to be erected
upon the property also contemplates that use and occupancy of
the property shall be commensurately restricted.

3. The word "family" denotes a concept, the application of

REFERENCES FOR POINTS IN HEADNOTES

[1] 40 Am Jur 2d, Hospitals and Asylums § 3.
41 Am Jur 2d, Incompetent Persons § 33.
[2] 20 Am Jur 2d, Covenants, Conditions and Restrictions §§ 189, 288,
299.
[3] 20 Am Jur 2d, Covenants, Conditions, and Restrictions §§ 196, 216.

which is dependent upon the basis of affiliation of the group being analyzed along with the public policies invoked by the particular circumstances of the situation; in the situation of a foster home for mentally handicapped children who live permanently in a residence, where they receive special care and treatment and where the number of persons assigned to the residence is restricted by license, the children and foster parent constitute a family as a matter of law within the purview of a covenant restricting buildings to single family dwellings.

Reversed.

1. MENTAL HEALTH—PUBLIC POLICY TO PROMOTE CARE AND TREATMENT OF MENTALLY HANDICAPPED.

It is the settled public policy of Michigan to promote the development and maintenance of quality programs and facilities for the care and treatment of the mentally handicapped.

2. COVENANTS—BUILDING RESTRICTIONS—PROPERTY—ENFORCEMENT OF RESTRICTIVE COVENANTS—INTERPRETATION OF RESTRICTIVE COVENANTS.

Restrictive covenants may constitute valuable property rights and it has been the policy of the judiciary to protect property owners who have complied with the restrictions from violations of the covenants by others; a restrictive covenant describing the character of permissible structures to be erected upon the property also contemplates that use and occupancy of the property shall be commensurately restricted.

3. COVENANTS—BUILDING RESTRICTIONS—SINGLE FAMILY DWELLINGS—DEFINITION OF FAMILY.

The word "family" denotes a concept, the application of which is dependent upon the basis of affiliation of the group being analyzed along with the public policies invoked by the particular circumstances of the situation; in the situation of a foster home for mentally handicapped children who live permanently in a residence, where they receive special care and treatment and where the number of persons assigned to the residence is restricted by license, the children and foster parent constitute a family as a matter of law within the purview of a covenant restricting buildings to single family dwellings.

*Milmet, Vecchio, Kennedy & Carnago, P. C.* (by *Donald E. Schuster),* for plaintiff.

Michigan Protection and Advocacy Service for

Developmentally Disabled Citizens (by *David T. Verseput* and *William J. Campbell*) and *Kenneth W. Ostrowski,* for defendants.

Before: BASHARA, P. J., and M. J. KELLY and ALLEN, JJ.

BASHARA, P. J. Defendants appeal from a summary judgment granted to plaintiff. That judgment permanently enjoined defendants from using a certain residence for treatment of six or less mentally retarded children. Treatment was rendered under an arrangement whereby six or fewer retarded children would live with a resident foster parent.

Plaintiff is an incorporated association of homeowners having their residences in the same subdivision as the foster care facility. The subdivision is comprised entirely of single-family residences, one of which is leased by defendant Residential Systems from defendant Hopping. Residential Systems is a charitable organization, within the meaning of the Internal Revenue Code,[1] that locates and leases residential property for the operation of foster care facilities for mentally retarded children.

The facility with which this litigation is concerned is licensed by the Department of Social Services pursuant to the child care organizations act.[2] At the time this action was initiated, four mentally retarded children and one foster parent lived in the residence on a permanent basis. Other personnel would visit the home during the day to

---

[1] *See* Int Rev Code of 1954, § 501(c)(3).

[2] MCL 722.111, *et seq.;* MSA 25.358(11), *et seq.* Although not specified in defendants' brief, from the nature of the services rendered, the facility would be licensed as a child caring institution as defined in § 1(a) of the act or a foster family group home as defined in § 1(e)(ii) of the act.

render care and treatment to the children. The children also attend special classes at the local public schools.

At such time as a child has sufficiently responded to treatment that he can return to the care of his parents, his residency at the facility terminates, and another child is assigned to the home by the Department of Social Services. Two additional children were scheduled to be assigned to the residence by the Department when this suit commenced. That assignment is being held in abeyance pending the resolution of this controversy.

All property in the subdivision is subject to a restrictive covenant limiting the type of structures built thereon to single-family residences.[3] Plaintiff alleged that defendants' use of the property was in violation of that covenant. The theory underlying that allegation was that six mentally retarded children residing with a foster parent for the purpose of receiving care and treatment of their affliction does not constitute a family as that term is used in the covenant.

Both parties moved for summary judgment. Each claimed that there was no genuine issue of material fact, and that the legal definition of family entitled them to prevail as a matter of law.

Defendants maintain that the judgment for plaintiff is erroneous, because the restrictive covenant controls only the type of structure that may be constructed, not the use and occupancy of the property. Further, defendants contend that the

---

[3] In pertinent part, the restrictive covenant provides as follows:
"*RESIDENTIAL LOTS.* All lots in said subdivision shall be known and described as residential lots. No structure shall be erected, altered, placed or permitted to remain on any residential lot other than one single private family dwelling with attached private garage for not less than two (2) cars, except as herein otherwise provided."

trial court erred in defining "family" to preclude defendants' use of the property as violative of the covenant, and that such result is contrary to this state's declared public policy.

Unquestionably, promoting the development and maintenance of quality programs and facilities for the care and treatment of the mentally handicapped is a settled public policy of our state. That policy has both a constitutional[4] and legislative[5] foundation. But we must also recognize that restrictive covenants may constitute valuable prop-

---

[4] *See* Const 1963, art 8, § 8, which provides:

"Institutions, programs and services for the care, treatment, education or rehabilitation of those inhabitants who are physically, mentally or otherwise seriously handicapped shall always be fostered and supported."

This section expanded the scope of the prior constitutional language, which was thought to be excessively restrictive, given the advances achieved in mental and physical treatment methodology. The revised language was intended to impart more expansive concepts into its meaning so as to avoid limiting treatment programs to those purely institutional in character. *See* Convention Comment, 2 MCLA, p 500.

[5] Of particular pertinence to the type of facility operated by defendants are the provisions of § 16a of 1943 PA 183 and 184, and § 3b of 1921 PA 207, all added by 1976 PA 394, 395, 396. Identically phrased, those sections denominate such facilities as residential uses for purposes of county, municipal, or township zoning, stating as follows:

"(1) As used in this section, 'state licensed residential facility' means a structure constructed for residential purposes that is licensed by the state pursuant to Act No. 287 of the Public Acts of 1972, as amended, being sections 331.681 to 331.694 of the Michigan Compiled Laws, or Act No. 116 of the Public Acts of 1973, as amended, being sections 722.111 to 722.128 of the Michigan Compiled Laws, which provides resident services for 6 or less persons under 24-hour supervision or care for persons in need of that supervision or care.

"(2) In order to implement the policy of this state that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings, a state licensed residential facility providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone." MCL 125.216a(1), (2), 125.286a(1), (2), 125.583b(1), (2); MSA 5.2961(16a) (1), (2), 5.2963(16a) (1), (2), 5.2933(2) (1), (2).

erty rights. *Kaplan v Huntington Woods,* 357 Mich 612, 617; 99 NW2d 514 (1959), *Monroe v Menke,* 314 Mich 268, 273; 22 NW2d 369 (1946). Further, it has been the policy of our judiciary to protect property owners who have complied with the restrictions from violations of the covenants by others. *Wood v Blancke,* 304 Mich 283, 287–288; 8 NW2d 67 (1943).

Where restrictive covenants describe the character of permissible structures to be erected upon the property, they also contemplate that use and occupancy of the property shall be commensurately restricted. *Bassett Building Co v Jehovah Evangelical Lutheran Church,* 371 Mich 459, 463; 124 NW2d 236 (1963), *Wood v Blancke, supra.* Covenants of restriction, especially those pertaining to residential use, preserve not only monetary value, but aesthetic characteristics considered to be essential constituents of a family environment. Consequently, failure to give complete effect to restrictive covenants in accordance with their import works a great injustice to the property owners. *Wood, supra.*

In the case under review, as the trial court correctly held, the property is restricted to single family use. As a result, the foregoing public policies confront one another in contest, with the legal concept of "family" resting at the fulcrum of determination.

Concerned with the legal definition of family, our Supreme Court, in the seminal case of *Carmichael v Northwestern Mutual Benefit Ass'n,* 51 Mich 494, 496; 16 NW 871 (1883), stated:

"Now this word 'family,' contained in the statute, is an expression of great flexibility. It is applied in many ways. It may mean the husband and wife having no children and living alone together, or it may mean

children, or wife and children, or blood relatives, or any group constituting a distinct domestic or social body. It is often used to denote a small select corps attached to an army chief, and has even been extended to whole sects, as in the case of the Shakers."

Our examination of subsequent cases and authority from other jurisdictions discloses no more specific definition of the term. Rather, the word family denotes a concept, the application of which is dependent upon the basis of affiliation of the group being analyzed juxtaposed with the public policies invoked by the particular circumstances of the case being reviewed.

For example, in *Carmichael* the Court construed family to encompass an unmarried man residing with an unrelated young woman so as to entitle her to the benefits from his life insurance policy. The Court observed that the man and girl had lived together since her early youth, and that he considered and cared for her as a daughter. Apparently, the Court perceived the man's voluntarily offered support and care for the child as a relationship favored by public policy.

That relationship was compared and contrasted by the Court with the situation presented in *Mutual Benefit Association of Michigan v Hoyt,* 46 Mich 473; 9 NW 497 (1881). In that case, the plaintiff attempted to secure the benefits from the decedent's life insurance policy. Although he resided with decedent, the Court found that he was endeavoring to obtain a financial advantage from the decedent's ailing health by acquiring insurance under which plaintiff named himself as beneficiary and paid the premiums. As noted by the *Carmichael* Court, the transaction was tainted by fraud and bad faith and was to be discouraged as a matter of public policy. *Carmichael, supra,* at 496.

Consequently, the relationship in *Hoyt* was found not to come within the meaning ascribed to "family".

Similarly, the term family has been interpreted so as to give effect to the public policy of discouraging meretricious relationships. *McDonald v Kelly Coal Co,* 335 Mich 325; 55 NW2d 851 (1952). But the religious affiliation between clergymen is perceived as a basis favored by public policy so as to constitute a single family use of property within the meaning of a restrictive covenant. *Boston-Edison Protective Ass'n v The Paulist Fathers, Inc,* 306 Mich 253; 10 NW2d 847 (1943). On the other hand, such a favored basis of affiliation does not inhere in the operation of a boarding house[6] or a college fraternity house.[7]

The basis of affiliation in the case under consideration is the mutual need of the children for expert treatment of their mental retardation. We have previously noted the momentous public policy supporting that endeavor. Defendants have afforded treatment to the children in an atmosphere that enables them to retain the benefits of residing in a household, instead of an institution. Further, parents of mentally retarded children may be encouraged to seek professional care for their children, knowing that they will reside in a homelike environment in lieu of being "institutionalized".

In analyzing a similar facility to discern the existence of family characteristics, the Court of Appeals of New York observed:

"It is significant that the group home is structured as

[6] *Nerrerter v Little,* 258 Mich 462; 243 NW 25 (1932).
[7] *Seeley v Phi Sigma Delta House Corp,* 245 Mich 252; 222 NW 180 (1928).

a single housekeeping unit and is, to all outward appearances, a relatively normal, stable, and permanent family unit, with which the community is properly concerned.

\*   \*   \*

"The group home is not, for purposes of a zoning ordinance, a temporary living arrangement as would be a group of college students sharing a house and commuting to a nearby school (cf. *Village of Belle Terre v Boraas,* 416 U.S. 1 [94 S.Ct. 1536, 39 L.Ed.2d 797 (1974)]). Every year or so, different college students would come to take the place of those before them. There would be none of the permanency of community that characterizes a residential neighborhood of private homes. Nor is it like the so-called 'commune' style of living. The group home is a permanent arrangement and akin to a traditional family, which also may be sundered by death, divorce, or emancipation of the young. Neither the foster parents nor the children are to be shifted about; the intention is that they remain and develop ties in the community. The purpose is to emulate the traditional family and not to introduce a different 'life style'." *City of White Plains v Ferraioli,* 34 NY2d 300, 304–305; 313 NE2d 756, 758; 357 NYS2d 449, 452 (1974).

The group in the instant case has those family characteristics described in *Ferraioli.* Indeed, the licensing legislation restricts the number of persons to be assigned to such facilities with the apparent intent being to impart, to the extent possible, a family image to the group.[8] The associational nexus of the group clearly occupies a favored position in our state's public policy.

Accordingly, we are constrained by the foregoing principles to conclude that the children and foster parent in this case constitute a family, as per-

[8] *See* MCL 722.111, *et seq.;* MSA 25.358(11), *et seq.* and note 5, *supra.*

ceived in the eyes of the law. Therefore, the defendants are entitled as a matter of law to a judgment dismissing the plaintiff's action.

Reversed. No costs, this being a public question.