The **METROPOLITAN DEVELOPMENT COMMISSION OF MARION COUNTY,**
Appellant (Plaintiff Below),

v.

The **VILLAGES, INC.,** Appellee
(Defendant Below).

No. 2–783A256.

Court of Appeals of Indiana,
Third District.

June 13, 1984.
Rehearing Denied July 17, 1984.

Larry F. Whitham, Asst. Corp. Counsel, Indianapolis, for appellant.

Curtis S. Travis, Hendrickson, Travis, Pantzer & Miller, Indianapolis, for amicus curiae.

Wilson S. Stober, Norman G. Tabler, Jr., Harry F. McNaught, Jr., Baker & Daniels, Indianapolis, for appellee.

HOFFMAN, Judge.

The Metropolitan Development Commission of Marion County filed suit against The Villages, Inc., to enforce its zoning ordinance and enjoin use of a single-family residence as a "foster care facility." The trial court denied the Commission's application for preliminary injunction and granted The Villages' request for judgment on the merits. The Commission appeals that decision.

On January 10, 1983, The Villages purchased a single-family residence at 6135 N. Meridian Street in Indianapolis for use as a group home. The group home concept is relatively new, and serves the purpose of placing abused, abandoned, and neglected children in a simulated family environment. The Villages proposes to hire a married couple to act as foster parents for up to ten foster children. Children will be placed in the group home under separate contracts by the courts or government agencies. For each child cared for, The Villages will be reimbursed at the rate of $36 per day.

The property in question is zoned D–3 under the Dwelling Districts Zoning Ordinance (DDZO) of Marion County, which permits the following uses:

"1.  ONE–FAMILY DWELLING, including Manufactured Homes as regulated in section 2.175.

2.  TWO–FAMILY DWELLING, (permitted on corner lots only).

3.  GROUP HOMES, as regulated in section 2.18.[1]

4.  TEMPORARY USES, as regulated in section 2.14.

5.  ACCESSORY USES, as regulated in section 2.15.

6.  HOME OCCUPATIONS, as regulated in section 2.16."

The DDZO specifically permits foster family care of children unrelated to residents by blood or adoption as an Accessory Use, under the following conditions:

"Accessory Uses:

a.  Shall be customarily incidental accessory and subordinate to, and commonly associated with, the operation of the primary use of the lot.

b.  Shall be operated and maintained under the same ownership and on the same lot as the primary use.

c.  Shall be subordinate in area, extent, and purpose to the primary use of building served...."

In its findings of fact and conclusions of law, the trial court specifically recognized the group home as a one-family dwelling, entitled to operate in the D–3 district as a matter of law. The Commission now maintains that the proposed group home does not constitute a one-family dwelling under the provisions of the DDZO.

█ Local governments may reasonably restrict the use of land into districts for the promotion of public health, safety, morals, and welfare. Euclid v. Ambler Realty Co., (1926) 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303. The police power of local legislative bodies may be properly used to limit the number of non-related persons inhabiting homes in residential districts without violating constitutional rights. Village of Belle Terre v. Boraas, (1974) 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797; see also, Moore v. Cleveland, (1977) 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531. Thus, the issue at bar is not constitutional

1.  No one contends that The Villages proposes a "group home" as that term is defined in the Ordinance. The Ordinance carefully defines "group home" as caring for "developmentally disabled children." This group home provision of the Ordinance was added in 1981 by the City-County Council and is a narrow one applying only to children who have developmental disabilities, as defined by IND.CODE §§ 16–10–2.1–1 and 16–13–1–3. Thus, the Council chose a definition of group home which all parties agree did not include the use in the case at bar.

in nature, but instead involves a question of statutory interpretation.

■ The construction of a zoning ordinance, like other statutes, is a question of law. 101A C.J.S. Zoning and Land Planning § 101. Courts may not interpret a statute or ordinance which is plain and unambiguous on its face. *Boone County State Bank v. Andrews*, (1983) Ind.App., 446 N.E.2d 618. Where an ambiguity does arise, the zoning ordinance involved must be construed to ascertain and effectuate the intent of the local legislative body. *Bd. of Zoning v. New Testament Bible Church*, (1980) Ind.App., 411 N.E.2d 681.

The term "family" is not defined in the DDZO. Normally, terms undefined within a statute must be given their plain, ordinary and usual meaning. *Sutto v. Board of Medical Regis. and Examination*, (1962) 242 Ind. 556, 180 N.E.2d 533. However, the word family has no less than twelve dictionary definitions and is not commonly associated with one plain or ordinary meaning. *See*, Webster's New Universal Unabridged Dictionary, Second Edition (1983).

In this instance, the legislative intent may be ascertained through intrinsic construction of the DDZO. Words and phrases in a single section of a statute or ordinance must be construed consistently and logically with other sections of the same act and with the act as a whole. *Ind. State Highway Comm. v. White*, (1973) 259 Ind. 690, 291 N.E.2d 550.

■ In this case, the legal maxim *expressio unius est exclusio alterius* [2] is particularly useful in ascertaining the legislative intent. In construing a statute, it is equally important to recognize what is not said as it is to recognize what is said. *Van*

*Orman v. State*, (1981) Ind.App., 416 N.E.2d 1301. In drafting the DDZO, the local legislative body promulgated separate and specific provisions for single-family dwellings and for foster care within the D–3 district. The specific provision for foster care as an accessory use necessarily excludes foster care from the general section authorizing single-family dwellings. Any other construction renders this specific regulation of foster care superfluous. Local legislators would not logically provide for foster care as an accessory use if it were also contemplated as a single-family dwelling use. The trial court erred as a matter of law in finding The Villages' group home to be a single-family dwelling.

■ Nor does the group home qualify as an accessory use. Any accessory use must be subordinate in area, extent, and purpose to the primary use of the lot. The Villages is a corporation which intends to hire two houseparents to provide care for ten foster children. These children are placed in the group home under separate contracts, and The Villages is compensated at a rate of $36 per day per child. Obviously, foster care is not subordinate to, but actually is the primary use of the proposed group home. As such, the proposed group home is not permitted as an accessory use, nor is it allowed under any category within the D–3 district.[3]

The Villages contends that its position is supported by the weight of authority in other jurisdictions which have considered this question. Instead of addressing the specific terms of the challenged ordinance, this position relies upon the *results* reached in cases construing distinctly different ordinances. It is the duty of this Court to interpret the challenged ordinance, giving

---

**2.** Black's Law Dictionary (5th ed. 1979) defines *expressio unius est exclusio alterius* as follows: "A maxim of statutory interpretation meaning that the expression of one thing is the exclusion of another. *Burgin v. Forbes*, 293 Ky. 456, 169 S.W.2d 321, 325; *Newblock v. Bowles*, 170 Okl. 487, 40 P.2d 1097, 1100. Mention of one thing implies exclusion of another. When certain persons or things are specified in a law, contract, or will, an intention to exclude all others from its operation may be inferred. Under this maxim, if statute specifies one exception to a general rule or assumes to specify the effects of a certain provision, other exceptions or effects are excluded."

**3.** The parties have stipulated that none of the other four use categories is applicable.

force and effect to the language of the local legislature, without regard to results reached in cases which may be clearly contrasted.

A majority of the cases cited may be distinguished on the basis that the ordinances concerned broadly define family to encompass unrelated individuals operating as a single-housekeeping unit. *E.g., Saunders v. Clark Cty. Zoning Dept.,* (1981) 66 Ohio St.2d 259, 421 N.E.2d 152. *See also,* Annot., 71 A.L.R.3d 697 (1976). Other cases have recognized that group homes are entitled to locate in residential areas where state statute pre-empts local government from excluding this use. *Costley v. Caromin House, Inc.,* (1981) Minn., 313 N.W.2d 21; *Hessling v. Broomfield,* (1977) 193 Colo. 124, 563 P.2d 12. At least one jurisdiction has recognized group homes for foster children as a single-family use *per se,* regardless of zoning prohibitions. *Group House of Port Washington v. Board of Zoning,* (1978) 45 N.Y.2d 266, 408 N.Y.S.2d 377, 380 N.E.2d 207; *White Plains v. Ferraioli,* (1974) 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756. The New York cases clearly establish a right which exceeds the constitutional requirements set forth in *Belle Terre, supra,* and *Moore, supra.* It is not the duty of this Court to grant extra-constitutional rights and privileges. Instead, the power to enact social legislation rests exclusively in the hands of the General Assembly or with local legislative bodies.

While the above-cited cases are distinguishable from this case, the Supreme Court of Ohio has handed down a well-reasoned opinion. *Carroll v. Washington Twp. Zoning Com'n,* (1980) 63 Ohio St.2d 249, 17 Ohio Op.3d 161, 408 N.E.2d 191. The *Carroll* court held that a group home operated principally for the care of foster children did not qualify as a single-family dwelling even where the ordinance failed to define or restrict the term family. In reaching this conclusion, the court stated that:

> [t]he term 'family,' when used without definition in a residential use restriction, must be interpreted in light of permissible zoning objectives. A political subdivision may legitimately segregate land uses in order to, *inter alia,* provide adequate fire and police protection, decrease noise and noxious odors, control traffic flow, limit land use intensity, and create reasonably secure and stable residential neighborhoods. The attainment of '[a] quiet place where yards are wide, people few, and motor vehicles restricted . . .' is a reasonable goal of land use legislation. *Village of Belle Terre v. Boraas* (1974), 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797.

\* \* \* \* \* \*

> "Local governments may, through the passage of zoning-type legislation, reasonably restrict the use of land into districts with the aim of promoting the public health, safety, morals and welfare. There is no constitutional prohibition in denying certain uses of one's property in a comprehensive plan for the development of communities for the common welfare of the community. *Euclid v. Ambler Realty Co., supra.* A comprehensive township zoning plan which excludes a use of this type is not *per se* unconstitutional.

> "The exercise of local discretion in areas of social and economic legislation will be approved where it is in accordance with law and, not in conflict with general law as enacted by the General Assembly; and where such local enactments are reasonable, not arbitrary, and bear a reasonable relationship to a permissible governmental objective."

408 N.E.2d at 193–194.

While the rationale set forth in *Carroll* is consistent with the decision reached in the case at bar, we reach our decision solely upon firmly established rules of statutory interpretation. The Villages' proposed group home does not constitute a single-family dwelling under the DDZO. Nor does such a group home, which operates for the principal purpose of caring for foster children qualify as an accessory use within the D-3 district.

The decision of the trial court is reversed.

Reversed.

NEAL, P.J., sitting by designation, concurs.

RATLIFF, J., sitting by designation, dissents with opinion.

RATLIFF, Judge, dissenting, sitting by designation.

I dissent. The contemplated use of the residence in question by The Villages as a group home for abused, abandoned, and neglected children in a simulated family environment constitutes a single-family dwelling within the restrictions of the zoning ordinance. Although the courts of Indiana have not had occasion to deal with this problem, that the proposed use meets the definition of single-family residence is clearly established by decisions from our sister states. *Hessling v. City of Broomfield,* (1977) 193 Colo. 124, 563 P.2d 12; *Hamner v. Best,* (1983) Ky.App., 656 S.W.2d 253; *Group House of Port Washington v. Board of Zoning,* (1978) 45 N.Y.2d 266, 408 N.Y.S.2d 377, 380 N.E.2d 207; *City of White Plains v. Ferraioli,* (1974) 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756; *Saunders v. Clark County Zoning Department,* (1981) 66 Ohio St.2d 259, 421 N.E.2d 152. In fact, it has been held that use of a residence for treatment of six or fewer mentally retarded children living with a resident foster parent was not violative of a restrictive covenant restricting use to single-family residences. *Bellarmine Hills Association v. Residential Systems Co.,* (1978) 84 Mich.App. 554, 269 N.W.2d 673. In my view, an examination of these cases compels a decision opposite to that reached by the majority.

*Hamner* is nearly identical factually to this case. There, a non-profit entity desired to use a large older home as a child care facility to house one married couple and from six to eight children. The applicable zoning ordinance restricted use of property within the area to single-family dwellings. Like the ordinance in question, the ordinance in *Hamner* did not define either "family" or "single family". The children would not be either juvenile offenders or mentally retarded requiring institutional type regulation. They would attend community schools and no professional counselors would live in the home. The Kentucky Court of Appeals held the proposed use was for a family residence rather than as an institution, saying:

"[T]he record contains substantial evidence that the residents of the home would function as, and resemble that of, any other single-family household. In fact, the evidence clearly indicates that the entire purpose of the group home is to provide a traditional home environment for the children; . . .

. . . .

Clearly, the term 'family', as determined by our highest court in the context of land use cases or zoning, may include unrelated individuals and has not been construed to refer only to those related by blood, marriage, or adoption."

656 S.W.2d at 255–56.

In *Hessling,* the Colorado court upheld the use of a residence as a live-in home for a married couple who would act as surrogate parents and not to exceed six mentally retarded children ranging in age from five to nine, as constituting a family thus meeting the zoning restriction limiting use to one family dwellings, so long as family characteristics were maintained.

*Group House of Port Washington* involved a non-profit corporation which had purchased a home for use as a group home which would consist of two surrogate parents and seven children. The home was intended as a replacement family for victims of unhappy homes and not as a detention center. The zoning ordinance restricted use to one-family residences and defined a family as one or more persons related by blood, marriage or legal adoption residing in a single housekeeping unit and allowed not more than two boarders all living in a common household. The New York Court of Appeals found no zoning violation and stated:

"The surrogate family which petitioner hopes to create is in fact a permanent family structure, and not a temporary residence for transients. . . .

Finally, we would emphasize that our decision today is limited to homes such as that described in this opinion, which serve as the functional equivalent of a family, for the exclusion of such groups would in no way further any valid public purpose. Whether a particular 'group home' comes within this description is essentially a factual question. Different factors would exist were petitioner to convert its group house, for example, from the type of operation described above into a home for delinquents or the mentally disturbed, and we express no opinion as to the proper result in such a case. Thus, we conclude only that the 'group home' described in this opinion is a permitted use as a one-family dwelling under the town zoning ordinances. Should the nature of the house change with the passage of time, however, should it become less of a surrogate family and more of an institution, it might then become an unpermitted use. On this record, however, we must conclude that petitioner's 'group home' is indeed a family."

45 N.Y.2d at 273–74, 408 N.Y.S.2d at 381, 380 N.E.2d at 211.

The New York Court of Appeals in *Ferraioli*, stated the issue thus:

"The issue is a narrow one: whether the 'group home', consisting of a married couple and their two children, together with 10 foster children, qualifies as a single 'family' unit, under the ordinance. It is concluded that the group home, set up in theory, size, appearance and structure to resemble a family unit, fits within the definitions of family for purposes of a zoning ordinance."

34 N.Y.2d at 300, 357 N.Y.S.2d at 450–451, 313 N.E.2d at 757.

In *Ferraioli*, a non-profit corporation licensed by the state to care for neglected and abandoned children had a group home consisting of the persons described in the court's statement of the issue. The couple was paid a salary and all expenses were paid by the corporation. "The children, natural and foster, live[d] together as if they were brothers and sisters and [the couple] were their common parents. The household [was] maintained as a family would be in a single housekeeping unit with kitchen facilities." 34 N.Y.2d at 304, 357 N.Y.S.2d at 451, 313 N.E.2d at 757. The zoning ordinance permitted single family dwellings for one housekeeping unit only. "Family" was defined as "one or more persons limited to the spouse, parents, grandparents, grandchildren, sons, daughters, brothers or sisters of the owner or the tenant or of the owner's spouse or tenant's spouse living together as a single housekeeping unit with kitchen facilities." 34 N.Y.2d at 304, 357 N.Y.S.2d at 451, 313 N.E.2d at 758. The court held the use was within the zoning restriction. The court stated:

"Whether a family be organized along ties of blood or formal adoptions, or be a similarly structured group sponsored by the State, as is the group home, should not be consequential in meeting the test of the zoning ordinance. So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance. . . .

In short, an ordinance may restrict a residential zone to occupancy by stable families occupying single-family homes, but neither by express provision nor construction may it limit the definition of family to exclude a household which in every but a biological sense is a single family. The minimal arrangement to meet the test of a zoning ordinance, as this one, is a group headed by a householder caring for a reasonable number of children as one would be likely to find in a biologically unitary family."

34 N.Y.2d at 305–06, 357 N.Y.S.2d at 452–453, 313 N.E.2d at 758–59.

A like result was reached in *Saunders.* There, a minister and his wife and five children lived at a large residence with as many as nine foster children. The home was later incorporated as a non-profit corporation. A few persons were employed to assist in caring for the children. The zoning was for single-family detached residences and the ordinance contained the following relevant definitions:

"4.08: *Boarding or Lodging House.* A building or part thereof, other than a hotel or restaurant, where meals and/or lodging are provided, for compensation, for five (5) or more persons not transients.

4.171: *Dwelling, Single-Family.* A building designed for or used exclusively by one family or housekeeping units.

4.174: *Dwelling Unit.* One room, or a suite of two or more rooms, designed for or used by one family for living and sleeping purposes and having only one (1) kitchen or kitchenette.

4.18: *Family.* A person living alone, or two or more persons living together as a single housekeeping unit, in a dwelling unit, as distinguished from a group occupying a boarding house, lodging house, motel or hotel, fraternity or sorority house."

66 Ohio St.2d at 262, 421 N.E.2d at 155. The zoning administrator issued a cease and desist order claiming the house was a boarding house. The Ohio Supreme Court found no violation of the ordinance. The court said:

"The definition of 'family' in this resolution is a broad one. In our view, any resolution seeking to define this term narrowly would unconstitutionally intrude upon an individual's right to choose the family living arrangement best suited to him and his loved ones. Those loved ones can just as easily be foster children as natural children for parents with compassion. A state or local government cannot constitutionally invade the private realm of family life. A family unit, which performs the social function of child-rearing, regardless of its relationship or composition or whether it includes foster children as well as natural children, is constitutionally protected against governmental intrusion not supported by a compelling governmental interest.

Therefore, ... we hold a family based group foster home for delinquent boys, who are unrelated by affinity or consanguinity to the foster parents, is a permitted use in an 'R–1 suburban residence district' where the zoning resolution defines the term 'family' as 'two or more persons living together as a single family housekeeping unit, in a dwelling unit,' where it defines 'dwelling unit' as 'one room or a suite of two or more rooms, designed for or used by one family for living and sleeping purposes and having only one (1) kitchen or kitchenette,' and where it defines 'single-family dwelling' as '[a] building designed for or used exclusively by one family or housekeeping unit.'

. . . .

We now interpret the term 'family' broadly in order to permit appellees to operate a foster home in an 'R–1 suburban residence district.' Such a board definition of 'family' is mandated by the Clark County Zoning Resolution, fundamental principles of zoning law, and immutable constitutional principles guaranteeing the right of every American to live with his family free from official harassment. [Citations omitted; footnote omitted.]"

66 Ohio St.2d at 263–65, 421 N.E.2d at 155–57.

The majority relies on an earlier Ohio case, *Carroll v. Washington Township Zoning Commission,* (1980) 63 Ohio St.2d 249, 408 N.E.2d 191, a case which is not even mentioned in *Saunders.* In my view, *Carroll* is not a sound decision, and I agree with the dissenting opinion of Justice Brown that "[t]he majority's resolution of this case [Carroll] is supported neither by logic nor by case law from [that] jurisdiction or any other." 63 Ohio St.2d at 253, 408 N.E.2d at 194.

The majority attempts to evade the holdings in *Saunders* and other cases cited herein by attempting to distinguish them "on the basis that the ordinances concerned broadly defined family to encompass unrelated individuals operating as a single-housekeeping unit." At 370. In fact, the ordinances in *Saunders, Ferraioli,* and *Group House of Port Washington* contained narrow definitions of family, but the courts, nevertheless, found the homes in question were not violative of the ordinance restricting use to single-family dwellings.

In my opinion, the group home proposed by The Villages meets the test of a single-family residence under the authorities herein cited. I would affirm the judgment.