ARDMORE PARK SUBDIVISION ASSOCIATION, INC v SIMON

Docket No. 57895. Submitted April 22, 1982, at Detroit.—Decided
June 9, 1982.

Patrice E. Simon erected a 6-foot-high fence on her property.
Ardmore Park Subdivision Association, Inc., brought an action
against Simon in Macomb Circuit Court contending that the
fence violates certain restrictions adopted by a majority of the
Ardmore Park property owners in 1975 and seeking injunctive
relief to compel Simon to remove the fence. The court, James
C. Daner, J., granted summary judgment in favor of defendant
on the ground that the original restrictions did not state that if
a majority agreed to change the restrictions the remaining
property owners would be bound by the amendments. The 1975
restriction was an amended one, for which neither defendant
nor her predecessor in title had voted. Plaintiff appeals. *Held:*

Where a deed restriction properly allows a majority, or a
greater percentage, of owners within a particular subdivision to
change, modify or alter given restrictions, other owners are
bound by properly passed and recorded changes in the same
manner as those contained in any original grant and restric-
tion.

Reversed.

1. Covenants — Deed Restrictions — Reciprocal Negative Ease-
ments.

A reciprocal negative easement arises where the owner of two or
more lots, so situated as to bear the relation, sells one with
restrictions of benefit to the land retained; the servitude be-
comes mutual, and, during the period of restraint, the owner of
the lot or lots retained may do nothing forbidden to the owner
of the lot sold.

2. Covenants — Reciprocal Negative Easements.

A reciprocal negative easement runs with the land sold; it is not

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 20 Am Jur 2d, Covenants, Conditions, and Restrictions § 173.
    25 Am Jur 2d, Easements and licenses § 8.
[4] 20 Am Jur 2d, Covenants, Conditions, and Restrictions § 268.

personal to owners but is operative upon the use of the land by any owner having actual or constructive notice thereof, passing its benefits and carrying its obligations to all purchasers of land subject to its affirmative or negative mandates.

3. COVENANTS — RECIPROCAL NEGATIVE EASEMENTS.

Reciprocal negative easements are never retroactive; they arise, if at all, out of a benefit accorded land retained by restrictions imposed upon neighboring land sold by a common owner; they do not arise and fasten upon one lot by reason of other lot owners conforming to a general plan.

4. COVENANTS — DEED RESTRICTIONS.

A deed restriction which properly allows a majority, or greater percentage, of owners within a particular subdivision to change, modify or alter given restrictions binds the other owners by properly passed and recorded changes in the same manner as those contained in any original grant and restriction.

*Santia & Novitke,* and *Gromek, Bendure & Thomas* (by *John A. Lydick),* of counsel, for plaintiff.

*Shurgin & Rosenberg,* for defendant.

Before: BRONSON, P.J., and D. F. WALSH and C. W. SIMON,* JJ.

C. W. SIMON, J. If Robert Frost's New England neighbors had met in the urban subdivision known as Ardmore Park in St. Clair Shores, they might have had more than ample reason to question why "Good fences make good neighbors". This seemingly innocuous litigation has struggled through the circuit court where defendant was granted summary judgment, GCR 1963, 117.2(3). The plaintiff association appeals. We reverse the grant of summary judgment and remand to the trial court.

At issue is a six-foot-high fence erected by defen-

* Circuit judge, sitting on the Court of Appeals by assignment.

dant on her property, allegedly in violation of subdivision building restrictions. When Ardmore Park was originally platted, building restrictions were recorded which encumbered the entire subdivision. Among the provisions applicable here is one allowing modification of the restrictions by a majority vote. It reads:

"These covenants are to run with the land and shall be binding on all parties and all persons claiming under them until January 1, 1975, at which time the covenants shall be automatically extended for successive periods of ten years unless by a vote of the majority of the then owners of the lots it is agreed to change the said covenants in whole or in part."

The original deed restrictions were duly amended in 1975 by a majority of those persons then owning the property in Ardmore Park. The amended restrictions included a prohibition against fencing over four feet in height. It is uncontested that defendant purchased her property on July 18, 1978, and that neither she nor her predecessor in title acceded to the amendment of the former restrictions.

The problem of reciprocal negative easements has received much in the way of judicial oversight as Michigan shifted to more and more urban communities. Subdivision proprietors and developers who sought to restrict the use of the lots that they sold used, and continued to use, building and use restrictions running with the land in each deed. The Michigan Supreme Court described the process in *Sanborn v McLean,* 233 Mich 227, 229-230; 206 NW 496 (1925):

"If the owner of two or more lots, so situated as to bear the relation, sells one with restrictions of benefit

to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained can do nothing forbidden to the owner of the lot sold. For want of a better descriptive term this is styled a reciprocal negative easement. It runs with the land sold by virtue of express fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction. It is not personal to owners but operative upon use of the land by any owner having actual or constructive notice thereof. It is an easement passing its benefits and carrying its obligations to all purchasers of land subject to its affirmative or negative mandates. It orginates for mutual benefit and exists with vigor sufficient to work its ends. It must start with a common owner. Reciprocal negative easements are never retroactive; the very nature of their origin forbids. They arise, if at all, out of a benefit accorded land retained, by restrictions upon neighboring land sold by a common owner. Such a scheme of restrictions must start with a common owner; it cannot arise and fasten upon one lot by reason of other lot owners conforming to a general plan. If a reciprocal negative easement attached to defendants' lot it was fastened thereto while in the hands of the common owner of it and neighboring lots by way of sale of other lots with restrictions beneficial at that time to it."

The trial judge refused to enforce the amended restrictions in the instant case. Relying on *Eveleth v Best*, 322 Mich 637, 641-642; 34 NW2d 504 (1948), he held that, because the original restriction did not state that a majority of the property owners agreeing to change the restrictions could bind those property owners not signing the amendments, the restrictions involved here did not bind those owners who did not sign the amendment, or those who succeeded to their title.

In *Eveleth v Best, supra,* plaintiffs successfully sued to enjoin the operation of an auto repair

garage. Defendants appealed to the Michigan Supreme Court, alleging that certain deed restrictions were not applicable to them. The Supreme Court agreed with defendants and reversed, holding that, since no owner of defendant's lot had ever consented to the deed restrictions sought to be imposed by the plaintiffs, the court would not enforce them against the defendants.

Likewise, where a covenant in deed restrictions allowed for the extension of the restrictions by a two-thirds vote of the owners and one party purchased property after the time for the extension vote had passed, the Supreme Court held that reciprocal negative easements could not be made retroactive and refused to enforce the reenacted restrictions. *Sampson v Kaufman,* 345 Mich 48, 51; 75 NW2d 64 (1956).

We find the law of *Eveleth* and *Sampson* inapplicable to the case before us. First, defendant's predecessor clearly was bound by the restrictions which provided that the covenants which obviously bound all owners could be changed by majority vote. Second, unlike the situation in *Sampson,* the majority owners made a timely exercise of their right, by valid covenant, to change the restrictions. We agree with the plaintiffs that the right to change the restrictions embodied in the original covenant means nothing whatsoever unless the right to change, plainly and unambiguously found in the original deed covenant, includes the right to bind all owners to the will of the majority. While no Michigan case like the one before us has been decided, several courts from other states have interpreted similar language.

In *Montoya v Barreras,* 81 NM 749, 751; 473 P2d 363 (1970), the court construed a similar covenant, stating:

"Examination of the entire declaration reveals that the original restrictions were clearly imposed on all of the described property. The declaration describes the property and is then followed by the granting clause which declares that all of the property shall be encumbered by the restrictions. Following this granting clause, twelve paragraphs of restrictive covenants are listed, including the provision in covenant (X) that they may be changed in whole or in part. The phrase 'in whole or in part' in covenant (X) clearly modifies the words 'to change,' and the direct object of 'to change' is the word 'covenants,' not the word 'lots.' Thus, the covenants may be changed in whole or in part, but we cannot construe this language as permitting any such change or changes to apply to only a portion of the lots on which the restrictions were imposed. Nor is there anything in the covenants themselves which can be construed as either expressly or impliedly modifying or changing the granting clause itself, which expresses the intent and purpose that all of the described property is encumbered by the restrictions, whether they remain as originally stated or are subsequently changed in whole or in part. The original restrictions were clearly imposed on all of the described property, and though the restrictions themselves may be changed in whole or in part, the change or changes which might be made must affect all of the described property."

See, also, *Riley v Boyle,* 6 Ariz App 523; 434 P2d 525 (1967), *Zent v Murrow,* 476 SW2d 875 (Tex Civ App, 1972), *Valdes v Moore,* 476 SW2d 936 (Tex Civ App, 1972), *Warren v Del Pizzo,* 46 Or App 153; 611 P2d 309 (1980), and the cases collected at 4 ALR3d 570, 582-586.

We hold that where a deed restriction properly allows a majority, or a greater percentage, of owners within a particular subdivision to change, modify or alter given restrictions, other owners are bound by properly passed and recorded changes in the same manner as those contained in any original grant and restriction.

Reversed. Costs to appellants.