McMILLAN ᴠ ISERMAN

Docket No. 56065. Submitted November 12, 1981, at Detroit.—Decided
    November 2, 1982.

Donald B. and Vicki McMillan and others brought an action in
    the Oakland Circuit Court against Billy J. and Joane Iserman
    and Alternative Living and Health Assistance, Inc., to enforce
    an amended deed restriction prohibiting the use of certain
    property as a state-licensed group residential facility. Defen-
    dants had entered into a lease to use the property as such a
    facility. The property was subject to a 1958 deed restriction
    allowing amendments at any time by a vote of three-fourths of
    the property owners subject to the restrictions. When defen-
    dants' proposed use of the property was first known, the prop-
    erty owners amended the restriction to prohibit the proposed
    use. The court, James S. Thorburn, J., granted summary judg-
    mĕnt for defendants, holding that the public policy favoring
    state-licensed group residential facilities could not override the
    amended deed restriction and that the amended restrictions
    could retroactively bind an owner and prohibit a prior valid use
    but that enforcement of the deed restriction would violate the
    Equal Protection Clause because the restriction discriminated
    against mentally retarded persons. Plaintiffs appealed and
    defendants cross-appealed. *Held:*

    1. A deed restriction which properly allows a majority, or
    greater percentage, of owners within a particular subdivision to
    change, modify or alter given restrictions binds the other
    owners by properly passed and recorded changes in the same
    manner as those contained in any original grant and restric-
    tion. However, such an amended deed restriction does not apply
    to any lot owner who, prior to the amendment, committed
    himself to a certain land use which the amendment seeks to

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 20 Am Jur 2d, Covenants, Conditions, and Restrictions § 173.
[4] 20 Am Jur 2d, Covenants, Conditions, and Restrictions §§ 173, 178,
    268.
[5, 8, 9] 20 Am Jur 2d, Covenants, Conditions, and Restrictions § 182.
[6] 17 Am Jur 2d, Contracts § 174.
[7] 20 Am Jur 2d, Covenants, Conditions, and Restrictions §§ 182, 277.

prohibit where the lot owner justifiably relied upon the existing restriction and had no notice of the proposed amendment and where the lot owner would be prejudiced by enforcing the amendment.

2. A deed restriction prohibiting the property from being used as a state-licensed group residential mental health facility is unenforceable because it is contrary to public policy favoring community residential care.

Affirmed.

MacKenzie, J., dissented. She would hold that the public policy favoring community residential mental health facilities as expressed by the Legislature is limited to zoning restrictions and does not extend to deed restrictions and that enforcement of a deed restriction precluding the use of property as a state-licensed group residential mental health facility does not amount to a denial of equal protection. She would reverse.

### Opinion of the Court

1. COVENANTS — DEED RESTRICTIONS — RECIPROCAL NEGATIVE EASE-MENTS.

A reciprocal negative easement arises where the owner of two or more lots, so situated as to bear the relation, sells ›one with restrictions of benefit to the land retained; the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained may do nothing forbidden to the owner of the lot sold.

2. COVENANTS — RECIPROCAL NEGATIVE EASEMENTS.

A reciprocal negative easement runs with the land sold; it is not personal to owners but is operative upon the use of the land by any owner having actual or constructive notice thereof, passing its benefits and carrying its obligations to all purchasers of land subject to its affirmative or negative mandates.

3. COVENANTS — RECIPROCAL NEGATIVE EASEMENTS.

Reciprocal negative easements are never retroactive; they arise, if at all, out of a benefit accorded land retained by restrictions imposed upon neighboring land sold by a common owner, they do not arise and fasten upon one lot by reason of other lot owners conforming to a general plan.

4. COVENANTS — DEED RESTRICTIONS.

A deed restriction which properly allows a majority, or greater percentage, of owners within a particular subdivision to change, modify or alter given restrictions binds the other

owners by properly passed and recorded changes in the same manner as those contained in any original grant and restriction; however, such amended deed restriction does not apply to any lot owner who, prior to the amendment, committed himself to a certain land use which the amendment seeks to prohibit where the lot owner justifiably relied upon the existing restriction and had no notice of the proposed amendment and where the lot owner would be prejudiced by enforcing the amendment.

5. COVENANTS — DEED RESTRICTIONS — MENTAL HEALTH — LICENSED RESIDENTIAL MENTAL HEALTH FACILITIES — PUBLIC POLICY.

A deed restriction prohibiting the property from being used as a state-licensed group residential mental health facility is unenforceable because it is contrary to public policy.

DISSENT BY MACKENZIE, J.

6. CONTRACTS — PUBLIC POLICY.

*The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which that doctrine rests.*

7. COVENANTS — DEED RESTRICTIONS — MENTAL HEALTH — LICENSED RESIDENTIAL MENTAL HEALTH FACILITIES — PUBLIC POLICY.

*A deed restriction prohibiting the property from being used as a state-licensed group residential mental health facility is not unenforceable because it is contrary to public policy; the public policy favoring community residential mental health facilities as expressed by the Legislature is limited to zoning restrictions and does not extend to deed restrictions (MCL 125.216a[2], 125.286a[2], 125.583b[2]; MSA 5.2961[16a][2], 5.2963[16a][2], 5.2933[2][2]).*

8. COVENANTS — DEED RESTRICTIONS — PUBLIC POLICY.

*Restrictive covenants may constitute valuable property rights and it has been the policy of the judiciary to protect property owners who have complied with the restrictions from violations of the covenants by others.*

9. COVENANTS — DEED RESTRICTIONS — MENTAL HEALTH — EQUAL PROTECTION.

*Enforcement of a deed restriction precluding the use of property as a state-licensed group residential mental health facility does not amount to a denial of equal protection.*

*Davidson,   Gotshall,   Kohl,   Secrest,   Wardle,*

*Lynch & Clark* (by *William P. Hampton* and *Michael L. Updike),* for plaintiffs.

*Shaheen, Kranson & Garrett* (by *Jon R. Garrett),* for defendants.

Before: M. F. CAVANAGH, P.J., and ALLEN and MACKENZIE, JJ.

M. F. CAVANAGH, P.J. Plaintiffs sued the defendants, alleging that the defendants' proposed use of property in their subdivision violated an amended deed restriction which prohibited the use of any subdivision lots for a state-licensed group residential facility, as that term is defined in MCL 125.216a; MSA 5.2961(16a), and MCL 125.583b; MSA 5.2933(2). The trial court granted the defendants' motion for summary judgment on the basis that the amended deed restriction discriminates against mentally impaired persons and thereby violates the Fourteenth Amendment to the United States Constitution. Plaintiffs appealed by right. Defendants cross-appealed, challenging the trial court's findings regarding the retroactive effect of the amended deed restriction and state public policy.

The issue which we must decide is whether the amended deed restriction prohibiting the use of subdivision property for a state-licensed group residential facility is valid and binding upon the defendants. The parties agree that the property in the subdivision is subject to a 1958 restrictive covenant which also provides that three-fourths of the property owners in the subdivision have the power to amend the restrictions at any time. We find our analysis somewhat hampered by the parties' failure to make the 1958 restrictive covenant a part of this record, especially since the defen-

dants argue that they are not bound by the amended deed restriction which was amended pursuant to the provisions of the 1958 covenant. Although the trial court ruled in the defendants' favor on constitutional grounds, we will first examine the retroactive effect of the amended deed restriction and its conflict, if any, with state public policy.

Defendants argue that the amended deed restriction may not be applied retroactively because to do so would subject the defendants to an impermissible retroactive reciprocal negative easement. The leading case in Michigan concerning reciprocal negative easements is *Sanborn v McLean,* 233 Mich 227; 206 NW 496 (1925). In that case the Michigan Supreme Court described a reciprocal negative easement in the following manner:

"It runs with the land sold by virtue of express fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction. It is not personal to owners but operative upon use of the land by any owner having actual or constructive notice thereof. It is an easement passing its benefits and carrying its obligations to all purchasers of land subject to its affirmative or negative mandates. It originates for mutual benefit and exists with vigor sufficient to work its ends. It must start with a common owner. Reciprocal negative easements are never retroactive; the very nature of their origin forbids. They arise, if at all, out of a benefit accorded land retained, by restrictions upon neighboring land sold by a common owner." 233 Mich 230.

In this case, the reciprocal negative easements consist of the 1958 deed restrictions, which apparently were validly imposed at a time when the subdivision property was in the hands of a common owner. The amended restriction is not, as

such, an impermissible retroactive reciprocal negative easement; such a term implies an independent new restriction placed on land and applied retroactively rather than a new restriction stemming from an amendment passed pursuant to an amending clause found in the original deed restrictions.

Courts in this state and in other jurisdictions generally recognize that land use covenants containing restrictions such as reciprocal negative easements may include a clause giving the grantees or lot owners the power to amend, modify, extend or revoke the restrictions and that any such action taken by the property owners applies to all of the properties which are subject to the restrictions. *Sampson v Kaufman,* 345 Mich 48; 75 NW2d 64 (1956); *Ardmore Park Subdivision v Simon,* 117 Mich App 57; 323 NW2d 591 (1982); *Riley v Boyle,* 6 Ariz App 523; 434 P2d 525 (1967); *Montoya v Barreras,* 81 NM 749; 473 P2d 363 (1970); *Valdes v Moore,* 476 SW2d 936 (Tex Civ App, 1972); Anno: *Validity, construction and effect of contractual provision regarding future revocation or modification of covenant restricting use of real property,* 4 ALR3d 570, 582-586, § 4(b). Cases concerning the issue of amended deed restrictions have generally dealt with parties opposing the amendment on the basis that it was not properly adopted *(i.e.,* less than the required number agreed to the amendment) or that the amendment would only apply to a portion of the restricted area. None of the cases we have found address a factual scenario similar to the one presented here, *i.e.,* relying upon the absence of any relevant deed restriction, defendants Iserman entered into a binding lease agreement with defendant Alternative Living Programs and Health Assistance, Inc., and subsequently the land use contracted for be-

came impermissible because of a new amendment
to the original deed restrictions. Thus, we are
concerned here with an amendment which imposes
a harsher restriction than any imposed in the
original deed restrictions and which becomes effec-
tive *after* a lot owner has detrimentally relied on
the absence of such a restriction.

This Court has not previously been faced with
the issue of whether amended deed restrictions
may be more restrictive than those contained in
the original deed restrictions. The facts in other
cases dealing with challenges to amended deed
restrictions usually involved an amendment which
is less restrictive. See *Couch v Southern Methodist
University,* 10 SW2d 973 (Tex Comm App, 1928);
*Valdes v Moore, supra.* In *Johnson v Three Bays
Properties #2, Inc,* 159 So 2d 924 (Fla App, 1964),
the Court considered an amendment that was
indisputably less restrictive yet the Court broadly
held that amended deed restrictions may be more
or less restrictive than the original deed restric-
tions. In *Van Deusen v Ruth,* 343 Mo 1096; 125
NW2d 1 (1938), the Court held that the word
"amend" contained in the original deed restric-
tions could not be construed as permitting the
imposition of harsher restrictions than those
which had been originally imposed. Recently in
*Ardmore Park Subdivision, supra,* a contested
amendment imposed a harsher restriction prohib-
iting fences over four feet in height, but the pro-
priety of imposing subsequent restrictions which
are more restrictive was apparently not at issue.

We are not prepared to say that a clause permit-
ting original deed restrictions to be amended must
be limited to allow for only the imposition of
restrictions which are less restrictive than those
originally imposed. As the plaintiffs point out,

defendants Iserman were on notice that the restrictions originally imposed and applicable to their land when they bought it were not absolute and could be amended at a later date. Presumably there was nothing in the amending clause which led defendants Iserman to believe that an amendment to the restrictions could only serve to lessen the original restrictions; the language of the clause itself has not been disputed by the parties. Although imposing a harsher restriction by amendment in and of itself does not trouble us, we are concerned with such an amendment when it seeks to affect a lot owner who has detrimentally relied on the absence of any such restriction.

Here we have lot owners who, in the absence of a deed restriction to the contrary, bind themselves by contract to a particular use of their land. After making this commitment, they are suddenly faced with an amendment to the deed restrictions, passed after they had bound themselves by contract, prohibiting such use of their land. To comply with the amended restriction would force them to be in breach of contract. We find this result to be manifestly unfair. Even with the knowledge that deed restrictions can be amended, lot owners have a right to rely on those restrictions in effect at the time they embark on a particular course of action regarding the use of their land, and subsequent amended deed restrictions should not be able to frustrate such action already begun.

For example, it certainly would be manifestly unfair to permit a subsequent amended deed restriction to force a lot owner to modify a pre-existing use or structure which does not conform to the amendment. If a lot owner builds a garage, a subsequent amended deed restriction prohibiting garages could not force the owner to tear down his

or her garage, which had been built when the owner relied on the absence of any such deed restriction. We see only a difference in degree between an amendment which seeks to affect a lot owner with a completed garage, a partially completed garage, or a contract to build a garage. In each case the lot owner would have, without notice to the contrary, relied on existing deed restrictions when embarking on the particular course of action, and a subsequent amendment should not be permitted to impose a hardship on such reliance.

We thus hold that an amended deed restriction does not apply to a lot owner who has, prior to the amendment, committed himself or herself to a certain land use which the amendment seeks to prohibit providing: (1) the lot owner justifiably relied on the existing restrictions (*i.e.,* had no notice of the proposed amendment); and (2) the lot owner will be prejudiced if the amendment is enforced as to his or her lot. Since we find that defendants Iserman justifiably relied on existing deed restrictions when they contracted with defendant Alternative Living Programs and Health Assistance, Inc., and since to enforce the amended deed restriction would result in forcing defendants Iserman to breach that contract, we hold that plaintiffs are estopped from asserting that the amended deed restriction applies to the lot owned by defendants Iserman.

Not only do we conclude that this amended deed restriction does not apply to the lot owned by defendants Iserman, but we also find that it is unenforceable on public policy grounds. We are not unmindful of the fact that courts should be wary of voiding a contract on the basis that it is contrary to public policy. *Skutt v Grand Rapids,* 275 Mich 258, 264; 266 NW 344 (1936). On the

other hand, such caution must give way when the court is faced with a contract provision which is "manifestly against the public interest". 275 Mich 265.

We recognize the fact that it is the established public policy of this state to permit and uphold certain restrictions upon the use and occupancy of real property. *Wood v Blancke*, 304 Mich 283, 287-288; 8 NW2d 67 (1943). However, it is also the settled public policy of our state to promote "the development and maintenance of quality programs and facilities for the care and treatment of the mentally handicapped". *Bellarmine Hills Ass'n v residential Systems Co*, 84 Mich App 554, 558; 269 NW2d 673 (1978), *lv den* 405 Mich 836 (1979). This policy is based in part upon Const 1963, art 8, § 8, which provides:

"Institutions, programs and services for the care, treatment, education or rehabilitation of those inhabitants who are physically, mentally or otherwise seriously handicapped shall always be fostered and supported."

This policy also finds legislative support in our zoning statutes, which state in pertinent part:

*"In order to implement the policy of this state that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings,* a state licensed residential facility providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone." (Emphasis added.) MCL 125.216a(2); MSA 5.2961(16a)(2).

The fact that a zoning statute limits its declaration of policy to zoning does not lessen to any degree the policy of this state to protect and foster facilities for the mentally handicapped.

With two such competing public policies in the scales and being faced with having to make a choice, we find that the scales in this case tip decidedly in favor of protecting the state-licensed residential facility for the mentally handicapped. As Judge McGREGOR stated, dissenting in *Jayno Heights Landowners Ass'n v Preston,* 85 Mich App 443, 454-455; 271 NW2d 268 (1978):

"In applying with the utmost caution the principle that restrictive covenants which violate public policy may not be enforced, I would find that the public policy favoring the establishment of residential adult foster care facilities outweighs the policy supporting the enforcement of residential restrictive covenants and that the covenant in question may not be enforced to enjoin defendants' use of this property as a licensed foster care facility. In reaching this result, it should be noted that the balance between the competing policies in this case is exceedingly close and that MCL 331.688(1); MSA 16.610(8)(1) serves to prohibit the excessive concentration of such facilities in any community. Residential homeowners are therefore protected from any detriments which may result from such a situation."

We conclude that the amended deed restriction here, specifically prohibiting state-licensed residential facilities for the mentally handicapped, is manifestly against the public interest and thus unenforceable on public policy grounds.

In light of our resolution of the two foregoing issues, we need not address the constitutional argument raised by the parties.

Affirmed.

ALLEN, J., concurred.

MacKenzie, J. *(dissenting).* I respectfully dissent. The parties agree that the property at issue is covered by a restrictive covenant dating back to 1958 which, among other things, permits three-fourths of the property owners within the subdivision to amend the restrictive covenant at any time. The covenant was amended on November 3, 1980, to include the following restrictions:

"1. All of the lots of this subdivision shall be owned, described and used for strictly private residential purposes only.

"2. No lot may be used for the operation of any business, enterprise, activity or service, profit or nonprofit, where the gross revenues, payments or other remuneration received by such businesses, enterprises, activities or services, or by the owners and/or operators of such businesses, enterprises, activities or services, exceed three thousand dollars ($3,000.00) per annum.

"3. No lot may be used for the operation of any state licensed residential facility, as that term is defined by Sections 125.216a, 125.286a and 125.583b of the Michigan Compiled Laws on January 1, 1980, such laws being more commonly referred to as MCLA Sections 125.216a, 125.286a and 125.583b. This restriction is to be liberally construed and is meant to exclude the operation of any State of Michigan-licensed facility that provides resident services for six (6) or less persons under 24-hour supervision or care for persons in need of that supervision or care, whether such residential facility is licensed pursuant to Public Act 287 of 1972, as amended, Public Act 218 of 1979, as amended, or pursuant to any Public Act of the State of Michigan that may be adopted in the future which supersedes or amends Public Act 287 of 1972 or Public Act 218 of 1979 in any way.

"4. No lot may be used for the operation of any business, enterprise, activity or service where the primary purpose of such business, enterprise, activity or service is to provide shelter, supervision and/or care to other persons in exchange for remuneration of any sort. This restriction shall not be interpreted so as to prevent

any property owner within the Huron Woods Subdivision from renting or leasing his home to another person or persons, providing that the person or persons do not then use the home to provide shelter, supervision and/or care to other persons in exchange for remuneration of any kind."

Defendants Iserman acquired the property at issue before the 1980 amendments. Defendants argue that the 1980 amendments were invalid because they imposed retroactive reciprocal negative easements. Defendants rely on *Sanborn v McLean,* 233 Mich 227, 230; 206 NW 496 (1925):

"Reciprocal negative easements are never retroactive; the very nature of their origin forbids. They arise, if at all, out of a benefit accorded land retained, by restrictions upon neighboring land sold by a common owner. Such a scheme of restrictions must start with a common owner; it cannot arise and fasten upon one lot by reason of other lot owners conforming to a general plan."

The difficulty with defendants' argument is that the provision of the restrictive covenant permitting amendment predates defendants' acquisition of the property at issue and apparently dates back to the time when all the property in the subdivision was in the hands of a common owner. Thus, the provision for amendment was itself a valid nonretroactive reciprocal negative easement.

Defendants rely on *Sampson v Kaufman,* 345 Mich 48; 75 NW2d 64 (1956). In that case the Court held that the renewal of certain provisions of a restrictive covenant by a vote of two-thirds of the property owners within a subdivision was invalid as creating retroactive reciprocal negative easements; however, in *Sampson,* renewal took place 21 months after the date specified in the

original restrictive covenant for renewal. *Sampson* cannot be read as prohibiting renewal or amendment of provisions of a restrictive covenant in accordance with the provisions in the original restrictive covenant for renewal or amendment.

As the majority correctly points out, other jurisdictions which have considered the issue have generally recognized as valid the amendment of a restrictive covenant in accordance with the provisions in the original covenant for amendment. Recently, in *Ardmore Park Subdivision v Simon,* 117 Mich App 57, 62; 323 NW2d 591 (1982), this Court held that:

"[W]here a deed restriction properly allows a majority, or a greater percentage, or owners within a particular subdivision to change, modify or alter given restrictions, other owners are bound by properly passed and recorded changes in the same manner as those contained in any original grant and restriction."

The majority proffers a theory of estoppel and detrimental reliance. However, an examination of the record discloses that none of the elements of estoppel are present here. In *Kole v Lampen,* 191 Mich 156, 157-158; 157 NW 392 (1916), the Court stated:

"It is a familiar rule of law that an estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts."

See also *Schudlich v Yankee,* 272 Mich 482, 486; 262 NW 395 (1935); *Fleckenstein v Citizens' Mu-*

*tual Automobile Ins Co,* 326 Mich 591, 599-600; 40
NW2d 733 (1950); *Holt v Stofflet,* 338 Mich 115,
119; 61 NW2d 28 (1953); *Campbell v City of Troy,*
42 Mich App 534, 540; 202 NW2d 547 (1972).
There can be no estoppel unless the party assert-
ing the defense has been misled to his prejudice by
the conduct of the person against whom the de-
fense is set up. *Odgers v Lentz,* 319 Mich 502, 507;
30 NW2d 43 (1947).

By what conduct of plaintiffs were defendants
misled? The restrictive covenant in effect at the
time defendants acquired the property gave defen-
dants notice that the covenant might be amended
at any time by three-fourths of the property own-
ers in the subdivision. There is no claim of any
explicit or implicit representation by plaintiffs
that the right to amend the covenant would not be
exercised. There is no claim that plaintiffs failed to
act promptly on learning of defendants' plans.
There is no claim that plaintiffs knew that defen-
dants had entered into a lease when they acted to
amend the covenant.

How have defendants suffered prejudice? This is
not a case in which defendants claim to have made
substantial improvements to the property on the
supposition that their proposed use of the property
would be permitted. Compare *Boston-Edison Pro-
tective Ass'n v Teahen,* 337 Mich 353, 358-359; 60
NW2d 162 (1953). Defendants have entered into a
lease, but defendants have never claimed that they
will suffer damages if the land use they envisioned
when they entered the lease is forbidden. In this
connection it should be noted that frustration of
purpose and impossibility of performance are well-
established defenses to an action for breach of
contract; see 17 Am Jur 2d, Contracts, §§ 401, 402,
404, pp 847-850, 851-853.

Defendants also argue that the restrictions were contrary to public policy and therefore void. In *Skutt v Grand Rapids*, 275 Mich 258, 264-265; 266 NW 344 (1936), the Court explained:

"We adopt as did the trial judge the following from *Pittsburg, C C & St L R Co v Kinney*, 95 Ohio St 64; 115 NE 505 (1916).

" 'What is the meaning of "public policy?" A correct definition, at once concise and comprehensive, of the words "public policy," has not yet been formulated by our courts. Indeed, the term is as difficult to define with accuracy as the word "fraud" or the term "public welfare." In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the State to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.

" 'Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people,—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man. It regards the primary principles of equity and justice and is sometimes expressed under the title of social and industrial justice, as it is conceived by our body politic. When a course of conduct is cruel or shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, though such policy has never been so written in the bond, whether it be Constitution, statute or decree of court. It has frequently been said that such public policy is a composite of constitutional provisions, statutes and judicial decisions, and some courts have gone so far as to hold that it is limited to these. The obvious fallacy of such a conclusion is quite apparent from the most superficial examination. When a contract is contrary to some provision of the Constitution, we say it is

prohibited by the Constitution, not by public policy. When a contract is contrary to statute, we say it is prohibited by a statute, not by a public policy. When a contract is contrary to a settled line of judicial decisions, we say it is prohibited by the law of the land, but we do not say it is contrary to public policy. Public policy is the cornerstone—the foundation—of all Constitutions, statutes, and judicial decisions, and its latitude and longitude, its height and its depth, greater than any or all of them. If this be not true, whence came the first judicial decision on matter of public policy? There was no precedent for it, else it would not have been the first.' "

.  Courts should act with caution in determining whether contracts are contrary to public policy and therefore void. Contracts should be declared void only in cases plainly within the reasons on which the doctrine rests. 275 Mich 264.

Defendants first seek an applicable public policy in certain zoning statutes. The following language appears as MCL 125.216a(2); MSA 5.2961(16a)(2), MCL 125.286a(2); MSA 5.2963(16a)(2), and MCL 125.583b(2); MSA 5.2933(2)(2):

"In order to implement the policy of this state that *persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings,* a state licensed residential facility providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property *for the purposes of zoning* and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone." (Emphasis added.)

The emphasized language shows that the Legislature expressly limited its declaration of policy to

zoning. To apply the statutes to void a restrictive covenant would be to ignore the plain language of the statute.

Defendants also seek an applicable public policy in a line of decisions of this Court which includes *Bellarmine Hills Ass'n v Residential Systems Co,* 84 Mich App 554; 269 NW2d 673 (1978), *lv den* 405 Mich 836 (1979); *Jayno Heights Landowners Ass'n v Preston,* 85 Mich App 443; 271 NW2d 268 (1978), *lv den* 405 Mich 828 (1979); *Malcolm v Shamie,* 95 Mich App 132; 290 NW2d 101 (1980); *Leland Acres Homeowners Ass'n, Inc v R T Partnership,* 106 Mich App 790; 308 NW2d 648 (1981); *Beverly Island Ass'n v Ziner,* 113 Mich App 322; 317 NW2d 611 (1982). The issue in these cases was not whether restrictive covenants were valid or void; rather, each case presented a dispute as to interpretation of a restrictive covenant. Each case turned on the particular language used in the covenant and the details of the facility at issue. In contrast, here the restrictive covenant expressly bars state-licensed residential facilities and prohibits the very type of facility that defendants propose to establish. These cases show that state-licensed residential facilities such as defendants planned to operate here are highly controversial; thus, we should not say that enforcement of the restrictive covenant here would be cruel or shocking to the average man's sense of justice.

Defendants rely on the following statement in *Bellarmine Hills, supra,* pp 558-559:

"Unquestionably, promoting the development and maintenance of quality programs and facilities for the care and treatment of the mentally handicapped is a settled public policy of our state. That policy has both a constitutional and legislative foundation. But we must also recognize that restrictive covenants may constitute

valuable property rights. *Kaplan v Huntington Woods,*
357 Mich 612, 617; 99 NW2d 514 (1959); *Monroe v
Menke,* 314 Mich 268, 273; 22 NW2d 369 (1946). Fur-
ther, it has been the policy of our judiciary to protect
property owners who have complied with the restric-
tions from violations of the covenants by others. *Wood v
Blancke,* 304 Mich 283, 287-288; 8 NW2d 67 (1943)."
(Footnotes omitted.)

The *Bellarmine Hills* Court identified two com-
peting public policies and used them as guides for
its interpretation of the restrictive covenant. In
view of the admonition in *Skutt, supra,* to act with
caution in determining whether contracts are void
as contrary to public policy and to apply the
doctrine only in cases plainly within the reason on
which the doctrine rests, we cannot give preclusive
effect to one of two competing public policies.

In this connection, see *Johnstone v Detroit, G H
& M R Co,* 245 Mich 65; 222 NW 325 (1928), in
which defendant had obtained the condemnation
of certain property for use as a railroad right-of-
way in return for contributing its old right-of-way
for highway purposes. The property obtained was
subject to a restrictive covenant limiting its use to
residential purposes. The Court held that in order
to use the condemned property for a purpose
violating the covenant, defendant would have to
obtain releases from owners of other lots in the
subdivision whose property was not physically
taken or obtain condemnation of their interests. It
was argued that enforcement of the covenant to
prevent use of the property for public purpose was
contrary to public policy; however, the Court re-
jected that argument in view of the public policy
favoring covenants restricting use of property to
residential purposes.

Defendants argue and the circuit judge held that

judicial enforcement of the restrictive covenant would amount to a denial of equal protection. In *Shelley v Kraemer,* 334 US 1, 10-11; 68 S Ct 836; 92 L Ed 1161 (1948), the Court held that judicial enforcement of a restrictive covenant was state action and therefore judicial enforcement of a covenant requiring racial discrimination amounted to a denial of the equal protection of laws guaranteed by US Const, Am XIV. However, the Court qualified its decision as follows:

"It should be observed that these covenants do not seek to proscribe any particular use of the affected properties. Use of the properties for residential occupancy, as such, is not forbidden. The restrictions of these agreements, rather, are directed toward a designated class of persons and seek to determine who may and who may not own or make use of the properties for residential purposes. The excluded class is defined wholly in terms of race or color; 'simply that and nothing more.'

\* \* \*

"It is likewise clear that restrictions on the right of occupancy of the sort sought to be created by the private agreements in these cases could not be squared with the requirements of the Fourteenth Amendment if imposed by state statute or local ordinance." (Footnote omitted.)

In contrast to the restrictions at issue in *Shelley,* the restrictions here proscribe a particular use of the affected properties, use as a state-licensed residential facility. No designated class of persons is excluded from ownership or use of the properties. Moreover, the restrictions here would not amount to a denial of equal protection if imposed by statute or ordinance. Compare *Village of Belle Terre v Boraas,* 416 US 1; 94 S Ct 1536; 39 L Ed

2d 797 (1974), in which the Court upheld a zoning ordinance which restricted land use to one-family dwellings excluding lodging houses, boarding houses, fraternity houses, or multiple dwelling houses. The ordinance specified that more than two persons living together but not related by blood, marriage, or adoption did not constitute one family. The Court found the ordinance to be reasonable rather than arbitrary and to bear a rational relationship to a permissible state objective, namely, preservation of the single family character of the neighborhood.

In view of the foregoing, I would reverse and remand for entry of an appropriate injunction.