MAATTA v DEAD RIVER CAMPERS, INC

Docket No. 248848. Submitted May 19, 2004, at Marquette. Decided
    September 21, 2004, at 9:10 A.M.

   Roger Maatta and other property owners in a development next to the
      Dead River Basin, a reservoir, brought an action in the Marquette
      Circuit Court against Dead River Campers, Inc., the plaintiffs'
      property owners association, seeking a permanent injunction
      against the continued use of a lot in the development for public
      access to the reservoir. The plaintiffs claimed that the use of the lot
      as a public access violates restrictive covenants that require that
      lots be used only for residential and incidental recreational purposes
      and that forbid activities that are offensive, annoying, or create a
      nuisance. The court, John R. Weber, J., entered a temporary
      injunction that closed the lot to the public. The defendant proposed,
      and a majority of the property owners adopted, a resolution exempt-
      ing the lot from the restrictive covenant requiring that lots be used
      for residential purposes. After a bench trial, the court upheld the
      exemption of the lot from the restrictive covenant requiring resi-
      dential use and determined that under a reasonable lot owner
      standard, the use of the lot for public access is not offensive,
      annoying, or a nuisance. The court lifted the temporary injunction
      and denied relief to the plaintiffs. The plaintiffs appealed.

      The Court of Appeals *held*:

      Amendments to a development's restrictive covenants that are
   not uniformly applicable to all properties governed by the cov-
   enants require the unanimous consent of all the property owners,
   not just a majority of the property owners. Land purchasers accept
   restrictive covenants and bind themselves to the burdens of those
   covenants because the resulting benefits are assured; each prop-
   erty owner relies on the fact that all are equally bound, and no
   burden can be imposed on one that is not assumed by all.
   Permitting non-uniform exemptions by a majority vote would
   destroy this crucial aspect of covenants.

      Consideration of whether the use of the lot violates the
   restrictive covenant pertaining to nuisance is not necessary in
   light of the resolution of the issue relating to amendments of
   restrictive covenants.

Reversed and remanded for further proceedings.

PROPERTY — DEVELOPMENTS — RESTRICTIVE COVENANTS — AMENDMENT.

Restrictive covenants may be amended only upon the unanimous approval of all the property owners in a development, not just a majority of property owners, when the amendment creates non-uniform restrictions applicable to less than all the properties in the development.

*Murphy & Clark* (by *Thomas H. Clark*) for the plaintiffs.

*McDonald, Marin & Kipper, L.L.P.* (by *William I. McDonald*), for the defendant.

Before: WHITBECK, C.J., and GRIFFIN and BORRELLO, JJ.

PER CURIAM. In this case of first impression, plaintiffs appeal as of right the trial court's order dismissing their complaint and dissolving a temporary injunction against defendant. Plaintiffs, who sought a permanent injunction preventing the use of a lot in the Dead River Basin development as a public access site, alleged that defendant's use of the site violated a restrictive covenant limiting the use of lots in the development to "single-family residential purposes and incidental recreational uses," and another forbidding activities that are offensive, annoying, or a nuisance. Because we find that the trial court erred by holding that defendant could, by supermajority vote, revoke a restrictive covenant regarding one particular lot, we reverse.

I. BACKGROUND

This case arises from plaintiffs' effort to enforce restrictive covenants against defendant, a corporate association of property owners, in a 375-lot residential development next to the Dead River Basin, a reservoir

created by the Hoist Dam in Marquette County in Michigan's Upper Peninsula. Defendant is a closed corporate association that bought three thousand to four thousand acres of land near the Dead River Basin. Defendant subdivided and sold lots and a corresponding share in the association. Most buyers had maintained "camps" or cabins on the land under license from the previous owner, Longyear Realty Corporation, for many years. Plaintiffs bought several of the seven lots shown on Assessor's Plat 23. Defendant retained ownership of lot 4 in plat 23, which had been used since the mid- to late-1970s as a public access site. Lot 4 is equipped with a concrete boat launch ramp, pit toilets, and a parking lot.

In the summer of 2001, after experiencing numerous problems because of the public accessing lot 4, plaintiffs attempted to pass a shareholder resolution closing it. The resolution failed. Plaintiffs then sought a permanent injunction against public access to lot 4, claiming that it violated covenant 4.1, which required that lots in the development be used only for residential and incidental recreational purposes, and covenant 4.2, which forbade activities within the development that were offensive or annoying or created a nuisance.

On November 21, 2001, the trial court entered a stipulated temporary injunction closing lot 4 until the litigation was resolved. In December 2002, defendant drafted a proposed shareholder resolution to exempt lot 4 from covenant 4.1, which resolution stated that the lease of lot 4 to the state would require the state to construct an alternate access road to the site. The covenants allowed amendments by affirmative vote of two-thirds of the 375 lot owners, or 250 owners. Two hundred sixty-six members voted in favor of the resolution.

At the end of a bench trial, the court ruled that the resolution exempted lot 4 from covenant 4.1. The court also ruled that covenant 4.2, "which limit[ed] activities and uses that would be annoying, offensive or a nuisance, in a lay sense, to the other lot owners require[d] the use of a community standard or a reasonable lot owner standard and not a subjective individual standard." The trial court then held that "[o]bjections by the plaintiffs to lawful recreational activities by members of the public who use the access for fishing and hunting and boating do not in this Court's opinion meet the reasonable lot owner test or community standard that I think has to apply." The court continued: "Anyway, I am going to do a balancing test, just so that review in this case can be complete, if necessary. And I think that will lead ultimately to this Court's conclusion that my decision to find against the plaintiffs is the fair thing to do." The court discussed the factors weighing against closure of lot 4 before concluding "the fair thing to do is to deny the plaintiffs relief." The trial court denied plaintiffs' subsequent motion for a new trial or a judgment notwithstanding the verdict, and plaintiffs now appeal.

## II. STANDARD OF REVIEW

This Court reviews de novo equitable actions. We review the findings of fact supporting the decision for clear error. *Webb v Smith (After Second Remand)*, 224 Mich App 203, 210; 568 NW2d 378 (1997).

## III. AMENDMENT OF THE RESTRICTIVE COVENANT

Plaintiffs raise an issue of first impression in our state. Specifically, plaintiffs argue that defendant was not permitted to amend the restrictive covenants to remove restrictions from one lot while leaving them

intact for the remaining lots. Plaintiffs contend that because the restrictive covenants were created and imposed uniformly on the lots they were intended to protect, property owners who assumed the burden of complying with restrictive covenants were entitled to receive the corresponding benefit of their neighbors' compliance unless the covenants stated otherwise. Plaintiffs state that although they were aware that the covenants at issue could be amended, they were entitled to—and did—rely on this principle of uniformity because the amendment procedure did not address or permit *non-uniform* amendments or exceptions. Plaintiffs argue that because nothing in the declaration of covenants permitted non-uniform amendments or exemptions, and because the declaration requires that "all buyers and subsequent owners must accept the Lots subject to the use restrictions set forth in this Declaration," the amendment procedure may only be used for uniform changes applicable to all lots. Plaintiffs contend that where another, non-uniform amendment or waiver, such as the single-lot exemption at issue here, is desired, the amendment requires the unanimous agreement of affected property owners.

The covenant at issue, § 4.1, states:

> Lots shall be used solely for the construction of one single-family residence and structures and outbuildings incidental to the use of it (including, without limitation, barns, stables and garages for private, and not public or commercial, use) and shall be limited in use to single-family residential purposes and incidental recreational uses.

Further, the provision governing the amendment procedure, § 10, reads:

> The covenants and restrictions set forth in this Declaration shall run with the land and be binding until ten (10)

years from the date of this Declaration and shall be automatically extended for successive periods of ten (10) years each, unless prior to any such expiration date, two-thirds (2/3) of the Lot Owners shall by affirmative written action vote to allow the same to expire. These restrictions may be amended by the affirmative written action of two-thirds (2/3) of the Lot Owners. So long as the Association owns an interest in the Development, this instrument may not be amended at any time without the consent of the Association. Any amendments shall become effective ten (10) days after notice of adoption of the amendment, together with a copy of the recorded amendment, is mailed to all Lot Owners.

Plaintiffs and defendant discuss two relevant Michigan cases, each side taking from them rules favorable to its position at trial: *Ardmore Park Subdivision Ass'n, Inc v Simon*, 117 Mich App 57; 323 NW2d 591 (1982), and *McMillan v Iserman*, 120 Mich App 785; 327 NW2d 559 (1982). In *Ardmore Park*, a covenant amendment uniformly prohibited all fences more than four feet tall. The circuit court refused to enforce the covenant against an owner who purchased property in the subdivision, after the amendment was passed, from an owner who had not supported the covenant amendment. This Court reversed, holding that "where a deed restriction properly allows a majority, or a greater percentage, of owners within a particular subdivision to change, modify or alter given restrictions, other owners are bound by properly passed and recorded changes in the same manner as those contained in any original grant and restriction." 117 Mich App 62. The Court also quoted from *Montoya v Barreras*, 81 NM 749, 751; 473 P2d 363 (1970):

> "Thus, the covenants may be changed in whole or in part, but we cannot construe this language as permitting any such change or changes to apply to only a portion of the lots on which the restrictions were imposed. Nor is there

anything in the covenants themselves which can be con-
strued as either expressly or impliedly modifying or chang-
ing the granting clause itself, which expresses the intent
and purpose that all of the described property is encum-
bered by the restrictions, whether they remain as originally
stated or are subsequently changed in whole or in part. The
original restrictions were clearly imposed on all of the
described property, and though the restrictions themselves
may be changed in whole or in part, the change or changes
which might be made must affect all of the described
property."

See, also, *Riley v Boyle*, 6 Ariz App 523; 434 P2d 525
(1967), *Zent v Murrow*, 476 SW2d 875 (Tex Civ App, 1972),
*Valdes v Moore*, 476 SW2d 936 (Tex Civ App, 1972), *Warren
v Del Pizzo*, 46 Or App 153; 611 P2d 309 (1980), and the
cases collected at 4 ALR3d 570, 582-586. [*Ardmore Park,
supra* at 62.]

Not quoted in *Ardmore Park*, but especially relevant
to facts of this case, the *Montoya* court continued:

Historically, restrictive covenants have been used to
assure uniformity of development and use of a residential
area to give the owners of lots within such an area some
degree of environmental stability. To permit individual lots
within an area to be relieved of the burden of such
covenants, in the absence of a clear expression in the
instrument so providing, would destroy the right to rely on
restrictive covenants which has traditionally been upheld
by our law of real property. [*Montoya, supra* at 751.]

The Supreme Court of New Mexico considered the
same issue again in *Ridge Park Home Owners v Pena*,
88 NM 563; 544 P2d 278 (1975). In that case, the court
explained why, even in a subdivision that permitted
both commercial and residential uses, unanimous con-
sent of all the lot owners was required to remove
residential use restrictions from fewer than all lots. The
covenants permitted amendments by a majority of lot
owners; the amendments changing two lots from resi-
dential to commercial use passed with support from

eighty-five percent of the lot owners, with the "dissenting minority consist[ing] mostly of the individuals living near and around the lots subject to the amendment." *Id.* at 565. Nonetheless, the court held that "[n]o changes may be made with respect to any one lot without affecting all the others subject to the restrictions." *Id.*

> The mutuality of restrictive covenants would be destroyed if we were to allow the majority of owners, who might not be adversely affected because of their insulated location in the subdivision, to authorize offensive consequences for the minority by removing or imposing restrictions only on certain lots within the minority's area. [*Id.*]

The other case decided by this Court cited by both plaintiffs and defendant, *McMillan,* involved an attempt to amend covenants uniformly, albeit with the intent of preventing the opening of a single adult group home in a property the defendants had leased. This Court held that, although the amendment was valid prospectively, plaintiffs were estopped from applying it to the defendant's lot because "(1) the [defendant] justifiably relied on the existing restrictions (*i.e.*, had no notice of the proposed amendment); and (2) the [defendant] will be prejudiced if the amendment is enforced." *McMillan, supra* at 793. Most relevant to this case, this Court also wrote:

> Even with the knowledge that deed restrictions can be amended, lot owners have a right to rely on those restrictions in effect at the time they embark on a particular course of action regarding the use of their land, and subsequent amended deed restrictions should not be able to frustrate such action already begun. [*Id.* at 792.]

Defendant asserts that "[t]he sum and substance of the majority's decision in *McMillan* is that amending restrictive covenants is acceptable, *as long as the*

*amendment does not cause a previously existing use to become a violation.*" Defendant asks, "If the *McMillan* court [were] correct that causing this type of instant violation would not be permitted by amendment, is there any reason to allow it to be caused by the initial restrictions?" However, factual differences distinguish this case from *McMillan*. In this case, plaintiffs did not impose amended covenants on defendant. Rather, defendant imposed the residential-use restriction on all the lots, at a time when a ten-year lease with the Department of Natural Resources for lot 4 would expire in nine months. Plaintiffs assert that the reliance interest to be protected in this case was their reliance on the original covenants, which bound all lots equally.

Plaintiffs also review the holdings of a number of the cases from other states that this Court cited in *McMillan*:

> Courts in this state and in other jurisdictions generally recognize that land use covenants containing restrictions such as reciprocal negative easements may include a clause giving the grantees or lot owners the power to amend, modify, extend or revoke the restrictions and that any such action taken by property owners applies to all of the properties which are subject to the restrictions. *Sampson v Kaufman*, 345 Mich 48; 75 NW2d 64 (1956); *Ardmore Park* [*supra*]; *Riley* [*supra*]; *Montoya* [*supra*]; *Valdes* [*supra*], and Anno: *Validity, construction and effect of contractual provision regarding future revocation or modification of covenant restricting use of real property*, 4 ALR3d 570, 582-586, § 4(b). [*McMillan, supra* at 790.]

The annotation states, "It would appear that any action taken by property owners to alter, extend, or revoke existing restrictions must apply to all of the properties which are subject to them." 4 ALR3d 570, 582.

Plaintiffs also analyze a case decided after *McMillan* that is directly on point with this case and that contains an extensive survey of how various states have dealt with the question of non-uniform covenant amendments, *Walton v Jaskiewicz*, 317 Md 264; 563 A2d 382 (1989). *Walton* involved an attempt by the defendant lot owners to exempt their lot from a restrictive covenant that prohibited further subdivision. The trial court found the exemption valid because it was passed according to the amendment procedure provided in the original covenant declaration. The appellate court reversed, and the Maryland Court of Appeals "granted certiorari to consider the important issue raised in the case." *Id.* at 267. The court considered the policy interest in free use of property asserted by the defendants, but then surveyed the cases nationally (including this Court's decisions in *Ardmore Park* and *McMillan)* to show that uniformity was essential to the protection provided by covenants. Because we find the court's reasoning both thorough and persuasive, we quote it at length here:

> The [defendants] also contend that public policy favors the free and unrestricted use of land, and thus requires that the Declaration of Covenants be construed as permitting the proposed amendment. They note that " 'where the language employed to express a restrictive covenant so far involves a doubt as to require construction, the rule is that such covenants are to "be strictly construed against the person seeking to enforce them," and that "all doubts must be resolved in favor of natural rights and a free use of the property." ' " *Harbor View Imp. Ass'n. v. Downey*, 270 Md. 365, 371, 311 A.2d 422 (1973), *quoting, Bartell v Senger*, 160 Md. 685, 693, 155 A. 174 (1931). While this rule may constitute a correct general statement of law, it is not applicable in the circumstances of this case as the language of the Declaration of Covenants plainly does not permit the amendment here involved.

Courts in other jurisdictions, construing similar language, have held that it is not ambiguous and that an amendment must apply uniformly to all lots subject to the restrictions. Thus, these courts have concluded that an attempt to exempt some lots from a restriction while retaining it as to others is invalid. *See, e.g., Camelback Del Este Homeowners v. Warner,* 156 Ariz. 21, 749 P.2d 930, 936 (1987) (noting that "unless otherwise provided for in the restrictions themselves, any amendment to restrictive covenants must apply to every lot"); *La Esperanza Townhome v. Title Sec. Agency,* 142 Ariz. 235, 689 P.2d 178, 182 (1984) (finding that the rule that an amended covenant must apply uniformly to all lots within a subdivision is the controlling law even when the proposed amendment seeks to release a few lots from all of the covenants as opposed to only a few of the restrictions); *Riley [supra]* (finding that "[t]he restrictions imposed pertain to *all* lots in the subdivision and a fair construction of the words permitting amendments indicate[s] that the power to amend is only as to restrictions for all lots in the subdivision") (emphasis in original); *Lakeshore Estates Recreational Area, Inc. v. Turner,* 481 S.W.2d 572, 574 (Mo. App. 1972) (finding that a proposed amendment to a restrictive covenant was ineffective to "release a single lot when the restrictions apply to a tract or parcel or block consisting of several lots"); *Cowherd Development Co. v. Littick,* 361 Mo. 1001, 238 S.W.2d 346, 349 (1951) (holding that the amendment procedure contained in a declaration of covenants did not authorize the majority of owners to extend the restrictions as to part of the lots and to release them as to others); *Ridge Park Home Owners [supra]* (holding that "[n]o changes may be made with respect to any one lot without affecting all the others subject to the restrictions"); *Zent [supra* at 878] (rejecting any rule which "would permit the majority of the lot owners to alter or revoke the restrictions as to a few lots only, and to continue the covenants as to all other property in the section" because such a rule would result in uncertainties and possible discrimination). *See also McMillan [supra]* (recognizing the principle that "land use covenants containing restrictions such as reciprocal negative easements may include a clause giving the grantees or lot

owners the power to amend, modify, extend or revoke the restrictions and that any such action taken by the property owners applies to all of the properties which are subject to the restrictions"); *Ardmore Park* [*supra*] (finding that any change to restrictions embodied in the original covenant must operate to bind all owners of property subject to the covenant). *Compare Steve Vogli & Co. v. Lane*, 405 S.W.2d 885, 889-90 (Mo. 1966) (upholding an amendment to covenants providing separate restrictions as to five lots within a subdivision when *all* lot owners, rather than the seventy-five percent required by the amendment provision, approved the exemption), and *Warren* [*supra*] (upholding an amendment to covenants where the amendment applied uniformly to all lots).

*   *   *

We agree with the principles so well articulated in *Montoya*. Moreover, as a number of courts have noted, property owners expect that covenants will be enforced uniformly and that owners will enjoy a degree of mutuality under the restrictions. *See, e.g., Lakeshore, supra,* 481 S.W.2d at 575 (noting that "[p]ersons who purchase lots in a subdivision subject to such use and occupancy restrictions do so upon the expectation of a benefit as well as the obvious burden or obligation of compliance"; and that "[t]hey expect the protection that compliance on the part of the rest of the lot owners affords them and absent their consent, they may not continue to be burdened when others are relieved" unless the modification applies uniformly to all lots); *Cowherd, supra,* 238 S.W.2d at 348 (noting that a prospective purchaser, when reading the restrictive covenants, would not expect "that the owners of a majority of . . . [the lots] in the subdivision would have the power to release the lots adjoining his lot from the restrictions and continue them as to others"); *Montoya, supra,* 473 P.2d at 365 (noting that traditionally, "restrictive covenants have been used to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability"). Consequently, "[t]o permit individual

lots within an area to be relieved of the burden of such covenants, in the absence of a clear expression in the instrument so providing, would destroy the right to rely on restrictive covenants which has traditionally been upheld by our law of real property." *Id.* at 365.

In addition, to allow a majority of lot owners to exempt one or more lots from a restrictive covenant, absent explicit language permitting the exemption, could have serious consequences for lot owners in the minority. For example, in *Ridge Park, supra,* a majority of lot owners approved an amendment removing residential restrictions on a few lots within the subdivision, despite the objection of a minority of lot owners whose property was located nearest to the proposed commercial development. The court held the amendment invalid for lack of uniformity noting that "[t]he mutuality of restrictive covenants would be destroyed if we were to allow the majority of owners, who might not be adversely affected because of their insulated location in the subdivision, to authorize offensive consequences for the minority of owners by removing or imposing restrictions only on certain lots within the minority's area." 544 P.2d at 280. As the court explained in *Riley* [*supra*],

"Taking these words to mean that particular lots could be excepted permits the obviously unintended result that 51 per cent of the owners could exempt their own property and leave the other 49 per cent encumbered or could even impose more strict restrictions upon certain lots. Certainly such an interpretation could easily result in a patchwork quilt of different restrictions according to the views of various groups of 51 per cent and completely upset the orderly plan of the subdivision. 434 P.2d at 528." [*Walton, supra* at 268-272.]

We conclude that the logic of the many courts cited in *Walton* is sound and should be followed here: Non-uniform covenant amendments require the unanimous consent of the affected property owners. Holding otherwise would leave present property owners in an uncertain position whenever their covenants allowed

for amendments with less than the unanimous consent of the affected owners. The fundamental premise that makes people willing to bind themselves to the burdens of restrictive covenants is that the resulting benefits are assured; each property owner relies on the fact that all are bound equally, so that no burden can be imposed on one that all are not willing to assume. Permitting non-uniform amendments and exemptions by majority or supermajority vote would destroy this crucial aspect of covenants and thus undermine the entire system of private regulation of real property in Michigan.

Plaintiffs also contest the trial court's resolution of its claim that defendant violated the restrictive covenant pertaining to nuisance. However, our holding that the trial court erred by ruling that the amendment was valid makes it unnecessary for us to address that issue.

Reversed and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.